Robert M. OWINGS

v.

**SECRETARY OF the UNITED STATES AIR FORCE (SAFOS), Appellant.**

No. 23473.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 28, 1970.

Decided June 30, 1971.

Petition for Rehearing Denied Sept. 30, 1971.

Mr. Michael C. Farrar, Atty., Department of Justice, with whom Thomas A. Flannery, U. S. Atty., and Robert V. Zener and Robert E. Kopp, Attys., Department of Justice, were on the brief, for appellant. Donald L. Horowitz, Atty., Department of Justice, and Broughton M. Earnest, Asst. U. S. Atty., also entered appearances for appellant.

Mr. Robert H. Reiter, Washington, D. C., for appellee.

Before TAMM, MacKINNON and ROBB, Circuit Judges.

MacKINNON, Circuit Judge:

In 1959, Owings (plaintiff-appellee) was a sergeant in the Air Force stationed at Itazuke Air Base, Japan. He devoted a great deal of his time to playing the slot machines and participating in other gambling at the Non-Commissioned Officers Club (hereafter the "Club") on the base. In due time his financial situation became precarious because of his large gambling losses but he continued writing checks which he expected to make good by *future* deposits of his pay and by *future* loans from relatives. He cashed many of these checks at the Club which gave in exchange therefor "military payment certificates" (hereafter "certificates"), a form of military script good only on the base.[1] These checks were drawn on his

1. Military payment certificates are an overseas medium of exchange for dollars or local currency where U.S. military forces are located. Miller v. United

account in a bank located in the United States.

On September 2, 1959, Owings conceived himself to be in financial difficulties and ordered his bank in the United States to stop payment on *all* checks payable to the Club (not on other checks). Thereafter he continued to cash checks at the Club and received military payment certificates in exchange therefor. Owings was subsequently court martialed for those checks he cashed *after* he issued the stop order to the bank.

In March 1960, Owings was charged before a Special Court Martial with seven counts of larceny in violation of Art. 121(a) (1) of the Uniform Code of Military Justice, 10 U.S.C. § 921(a) (1).[2] The Charge Sheet contained seven specifications referring to seven checks totaling $850 which Owings had cashed at the Club after issuing the stop payment order.[3] A Special Court Martial found him guilty on all specifications and sentenced him to a bad conduct dishard labor and reduction in rank. The Board of Review (hereafter the "Board") found the evidence insufficient to support the conviction for larceny, since there was testimony showing that Owings did not intend *permanently* to keep the money, but found it to be sufficient to support the lesser included offense of *wrongful appropriation* under Art. 121(a) (2). Wrongful appropriation only requires an intent *temporarily* to appropriate the property to his own use or to deprive another person of its charge, forfeiture of pay, three months use and benefit.[4] In its decision the Board found Owings' "manipulative behavior * * * is that of an individual who resorted to worthless checks to *temporarily* relieve his financial difficulties rather than that of one who uttered worthless checks with no intent to ever redeem them." (Emphasis added). However, the Board approved the sentence of the court martial and this decision was concurred in by the Judge Advocate General.

Owings received notice of the Board's decision on October 10, 1960 and was informed that under Art. 67(c) of the Uniform Code of Military Justice (10 U.S.C. § 867(c)) he had 30 days to petition the United States Court of Military Appeals (the court) for review. He first indicated he did not wish to appeal to such court but later on October 28, 1960 changed his mind and requested the appointment of counsel for an appeal. He contended he lacked felonious intent. However, after consulting with his counsel, on November 4, 1960, he withdrew his appeal. Subsequently in 1962 and

---

States, 134 U.S.App.D.C. 190, 191, 413 F.2d 1097, 1098 (1969). Their purpose is to protect local currency and to prevent black market operations.

2. 10 U.S.C. § 921 (70A Stat. 73) provides:
   (a) Any person subject to this chapter who wrongfully takes, obtains, or withholds, by any means, from the possession of the owner or of any other person any money, personal property, or article of value of any kind—
   (1) with intent permanently to deprive or defraud another person of the use and benefit of property or to appropriate it to his own use or the use of any person other than the owner, steals that property and is guilty of larceny; or
   (2) with intent temporarily to deprive or defraud another person of the use and benefit of property or to appropriate it to his own use or the use of any person other than the owner, is guilty of wrongful appropriation.
   (b) Any person found guilty of larceny or wrongful appropriation shall be punished as a court-martial may direct.

3. Specification 4 of the Charge Sheet is typical of the seven specifications which vary only as to amount:
   Specification 4: In that Staff Sergeant Robert M. Owings * * * did at Itazuke Air Base Administrative Annex, Japan, on or about 21 September 1959, steal Military Payment Certificates of a value of $500.00, the property of the Itazuke Air Base, Non-Commissioned Officer's Open Mess Fund.
   App. 28.

4. *See* note 2 *supra*.

again in 1965, Owings requested the Court of Military Appeals to reopen and review his case. Pursuant to the 1965 petition the Court of Military Appeals directed the Air Force to appoint counsel to represent Owings and thereafter Owings filed in that court a "Supplement to Petition for Appeal Filed Approximately 28 October 1960" in which he alleged for the first time that the $850 in checks on which his court martial was based were checks covering gambling losses. On July 29, 1965, the court denied the petition for review.[5] Thereafter on January 28 1966, the court issued its decision in United States v. Wallace, 15 USCMA 650 (1966) upsetting a court martial conviction for writing bad checks to pay gambling *losses* and thereafter Owings filed a new petition for review with the Court of Military Appeals which also was denied on April 15, 1966.[6]

Owings previously had also filed a complaint in the United States District Court for the District of Columbia against the Secretary of the Air Force (hereafter the "Secretary") seeking review of his court martial conviction and sentence, correction of records and

---

5. United States v. Owings, Case No. 18,667, July 29, 1965. Order Denying Petition for Review. A complete chronology of the court martial and subsequent review proceedings follows:

16–22 September 1959—Checks uttered (App. 174)

16 March 1960 —Court Martial convenes and finds Owings guilty of larceny (App. 174, 176)

25 April 1960 —Convening authority approved findings and sentence (App. 176)

6 June 1960 —Member of Office of Staff Judge Advocate, 41st Air Division, recommended against clemency on ground Owings' usefulness to the service had been destroyed (App. 176)

27 June 1960 —Commanding General, 41st Air Division (officer exercising general court martial jurisdiction) approved sentence as approved by convening authority and referred the matter for appellate review (App. 177)

10 October 1960 —Board of Review found evidence only sufficient to convict of wrongful appropriation. Confirmatory court martial order issued at Travis A.F.B., California (App. 177)

14 October 1960 —Received bad conduct discharge (App. 177)

January 1961 —Applied to Air Force Discharge Review Board for honorable discharge (App. 177)

14 February 1961 —Board denied request for change in discharge (App. 177–78)

13 November 1962 —Applied to Air Force Board for Correction of Military Records to change his discharge to honorable (App. 178)

25 January 1963 —Correction Board denies request (App. 178)

11 February 1963 —Notified of Correction Board decision (App. 178) Numerous unsuccessful attempts to Correction Board to reconsider prior action (App. 178)

15 April 1965 —Applied to Correction Board to correct record to show honorable discharges on 18 May 1953 and 24 November 1955 (App. 178)

20 September 1965 —Advised that 15 April 1965 application was denied (App. 178)

4 March 1966 —Reapplied to Air Force Discharge Review Board for change in nature of his discharge claiming he was not amenable to prosecution for gambling debt (App. 159, 178)

6. United States v. Owings, *supra* note 5, Order of April 15, 1966.

$50,000 damages.[7] The District Court granted the Secretary's motion to dismiss the complaint and on appeal we upheld the dismissal of the complaint[8] on the ground that Owings had not exhausted his administrative remedies but without prejudice to the filing by Owings of a new application in the District Court predicated upon a showing that the remedies under 10 U.S.C. §§ 1552, 1553[9] had been sought and denied, if that be the fact. Owings then filed a supplemental complaint in the District Court where on the motion of the Secretary of the Air Force the proceedings were stayed pending Owings' application for an administrative decision.

In March 1966, Owings had already applied for relief to the Board for Correction of Military Records (hereafter the "Correction Board"), citing United States v. Wallace, *supra*. He contended that his court martial was improper on the ground that gambling was against public policy and that criminal punishment should not be imposed for crimes involving the non-payment of gambling obligations. The Correction Board denied the application and the decision was approved by the Under Secretary of the Air Force on October 25, 1967.

Thereafter the District Court resumed consideration of the case and eventually granted plaintiff's motion for summary judgment. In doing so it ruled that the Correction Board had erred "in failing to conclude that the court martial sentence directing plaintiff's bad conduct discharge is void as violative of plaintiff's constitutional rights and in failing to, appropriately correct the record pursuant to 10 U.S.C. § 1552."[10] In a memorandum opinion 298 F.Supp. 849, the District Court found that it had jurisdiction to review "the record in the case including its merits to the extent a decision might have been without basis in fact or to the extent an issue of constitutional proportions may be raised."[11] After such statement the court found that "the [Correction] Board failed to recognize the effect of the *Wallace* decision and the resulting fact that plaintiff was found guilty of an offense which under military law is not a crime."[12] This, the court concluded, constituted an injustice of constitutional proportions

---

7. *See* note 9, *infra*.

8. Owings v. Secretary of United States Air Force, Misc. No. 2746, September Term, 1965, Per Curiam, D.C. No. 2381–65 Civil:

     On consideration of petitioner's petition for rehearing, it is

     ORDERED by the court that petitioner's aforesaid petition is denied without prejudice to the filing by petitioner of a new application in the District Court predicated upon a showing that the remedies under 10 U.S.C. §§ 1552 and 1553 have been sought and denied, if that be the fact. Without intimating any decision thereon, we believe that the possibility of jurisdiction under the principles of Ashe v. McNamara, 355 F.2d 277 (1st Cir. 1965) warrants consideration by the District Court.

9. 10 U.S.C. § 1552(a), relating to Correction of Military Records, provides:

     The Secretary of a military department, under procedures established by him and approved by the Secretary of Defense, and acting through boards of civilians of the executive part of that military department, may correct any military record of that department when he considers it necessary to correct an error or remove an injustice. * * * Except when procured by fraud, a correction under this section is final and conclusive on all officers of the United States.

   10 U.S.C. § 1553(b), relating to Review of Discharges and Dismissals, provides:

     Each board shall have authority, except in the case of a discharge or dismissal resulting from the sentence of a general court-martial, to change, correct, or modify any discharge or dismissal, and to issue a new discharge in accord with the facts presented to the board. The findings of each board shall be subject to review only by the Secretary concerned.

10. *Supra* note 9.

11. App. 293.

12. *Id.* at 295.

and remanded the case to the Correction Board "with directions to take appropriate corrective action pursuant to this judgment" with the court retaining jurisdiction.

On this appeal the Secretary of the Air Force (appellant) makes two contentions: First, that Art. 76 of the Uniform Code of Military Justice precludes judicial review of court martial proceedings by civilian courts except by habeas corpus. Secondly, that even if Owings may make a collateral attack in a civil court upon his court martial conviction, the scope of review in that court is limited to constitutional defects and no such defect is presented here. Without in any way deciding the first issue, we dispose of the case adversely to Owings' contentions on the second point since we find that the facts here present no constitutional defect.

I

■ Owings first contends that he should have been tried by a General Court Martial rather than by a Special Court Martial. When he was charged he had the rank of Staff Sergeant attached to District Office 47, 6001st Special Investigative Squadron, Pacific Air Force, United States Air Force. As such he was a member of a regular component of the armed forces and thereby a person subject to the Uniform Code of Military Justice (UCMJ). Art. 2 UCMJ, 10 U.S.C. § 802(1),[13] 70A Stat. 37. Under Art. 19 of the Uniform Code of Military Justice, 10 U.S.C. § 819,[14] 70A Stat. 43, a special court martial had statutory jurisdiction to try him for the non-capital offense of larceny, and the lesser included offense of wrongful appropriation, as defined by Art. 121, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 921 (70A Stat. 73). The sentence adjudged was also authorized by Article 121, within the power conferred on Special Courts-Martial by Art. 19, 10 U.S.C. § 819 [15] (70A Stat. 43), and since a complete record of the proceedings and testimony before the court was made it was authorized to adjudge a bad conduct discharge.[16]

II

■ It is next contended that it was improper for the Board of Review (Board) to set aside so much of each specification as exceeded the findings that Owings did wrongfully appropriate money of the sums and ownership alleged, in violation of Art. 121, Uniform Code of Military Justice.[17] By such action the Board set aside the conviction for larceny and found Owings guilty of the lesser included offense of wrongful

---

13. 10 U.S.C. § 802(1) provides:

The following persons are subject to this chapter:

(1) Members of a regular component of the armed forces, including those awaiting discharge after expiration of their terms of enlistment; volunteers from the time of their muster or acceptance into the armed forces; inductees from the time of their actual induction into the armed forces; and other persons lawfully called or ordered into, or to duty in or for training in, the armed forces, from the dates when they are required by the terms of the call or order to obey it.

14. 10 U.S.C. § 819 provides:

Subject to section 817 of this title (article 17), special courts-martial have jurisdiction to try persons subject to this chapter for any non-capital offense made punishable by this chapter and, under such regulations as the President may prescribe, for capital offenses. Special courts-martial may, under such limitations as the President may prescribe, adjudge any punishment not forbidden by this chapter except death, dishonorable discharge, dismissal, confinement for more than six months, hard labor without confinement for more than three months, forfeiture of pay exceeding two-thirds pay per month, or forfeiture of pay for more than six months. A bad-conduct discharge may not be adjudged unless a complete record of the proceedings and testimony before the court has been made.

15. *Id.*

16. *Id.*

17. The members of the court were also instructed on their ability to find the accused guilty of the lesser included offense of wrongful appropriation.

appropriation. Both offenses are defined by Art. 121 [18] and it is clear that wrongful appropriation is a lesser included offense of larceny as defined by the statute and as charged in the instant specifications. The ability of a court or jury to find an accused guilty of a lesser included offense is a practice of long standing. It stems from the right of trial courts to return a partial verdict. Dynes v. Hoover, 20 How. 65, 79–80, 15 L.Ed. 838 (1857). Court martial practice makes elaborate use of included offenses and it is well recognized that the charging of an accused with certain offenses may include certain other offenses.[19] The Federal Criminal Rules also so authorize finding defendants guilty of included offenses.[20] The Board thus clearly had authority to approve so much of the finding as included the offense of wrongful appropriation.[21]

### III

■ The Board for the Correction of Military Records (Correction Board) is also attacked for allegedly delegating its decision-making authority to the Judge Advocate General of the Air Force. This charge arose out of the appearance on August 23, 1967 of Owings' counsel before the Correction Board. This appearance was confined to an argument by Owings' counsel of his views concerning the case and to a discussion of various matters with the Board. No evidence was introduced and Owings was not present. There was frequent reference to the court martial record.

Owings' counsel advised the Board in definite terms as to what the law was on several important points. He was quite expansive in informing the Correction Board that the Board of Review had found that Owings had no criminal intent whatsoever and that it was therefore unconstitutional to convict him of wrongful appropriation and improper to give him a bad conduct discharge. Also, he asserted it was unconstitutional to find Owings guilty of wrongful appropriation as a lesser included offense and that "there is nothing wrong about a man going out and pulling a check-kiting scheme like this and being able to get away with it." "[T]hose are not criminal acts." He also presented his claim that the checks were for a gambling "obligation" (App. 223) and hence could not support a criminal conviction.

None of the members of the Correction Board were lawyers and when legal and factual questions arose they twice informed Owings' counsel during the hearing that they could consult their own counsel (App. 216, 240). In due time they referred the transcript to the Acting Chief, Military Justice Division, Office of the Judge Advocate General, who reviewed the arguments of Owings' counsel and submitted written comments covering both the law and some of the facts since Owings' counsel had made interrelated representations with respect to both. The Correction Board included such comments, without comment of their own, in their report to the Secretary of the Air Force. The report of

---

18. *See note 2, supra.*

19. For Table of Commonly Included Offenses, see Appendix 12, p. A 12–1 to 6, Manual for Courts-Martial, United States (Rev. ed. 1969).

20. Fed.R.Crim.P. 31(c) provides:
"The defendant may be found guilty of an offense necessarily included in the offense charged * * *"
The source of this Rule was Rev.Stat. § 1035, and was formerly set out as 18 U.S.C. § 565.

21. 10 U.S.C. § 859(b) provides:
Any reviewing authority with the power to approve or affirm a finding of guilty may approve or affirm, instead, so much of the finding as includes a lesser included offense.
"Wrongful appropriation" is shown as an included offense of larceny in Air Force Summary of Changes in the current Manual for Courts-Martial, United States, 1969, p. A 12–4 (Rev. ed.). There has been no change in Art. 121 since it was enacted August 10, 1956 (70A Stat. 73).

the Correction Board concluded that Owings "failed to show any legal error and the record fails to show any equitable grounds for granting his request" and recommended to the Secretary that his application for correction of military record be denied.

The comments from the office of the Judge Advocate General were short, covering less than two typewritten pages. We have read them and consider them to be correct.[22] We are also of opinion that it was proper for the Correction Board to request legal advice on the legal and factual arguments advanced by Owings' counsel. The Correction Board is not a court and there is no requirement that its members be learned in the law. The statutory authority for such boards provides:

> The Secretary of a military department [Army, Navy, Air Force] under procedures established by him and approved by the Secretary of Defense, and acting *through* boards of civilians of the executive part of that military department, may correct any military record of that department when he considers it necessary to correct an error or remove an injustice.
> * * *

10 U.S.C. § 1552(a) (emphasis added). Thus it is the Secretary who is authorized to correct the military record and he establishes the procedure, with the approval of the Secretary of Defense, for the operation of the Board. The Secretary acts after findings and recommendations of boards of civilians, who are in the executive part of the military department. Such recommendation was submitted here (App. 137, 138–158). The holding of a hearing is discretionary with the Correction Board,[23] and applications may thus be decided without a hearing (32 C.F.R. § 865.7), which would obviously be on the basis of the internal files and staff work. That discretion was exercised to hear Owings' counsel and since his presentation was "largely legal," no one appeared to represent the Air Force and the Correction Board considered that additional information was essential for its decision. We consider it to have been entirely proper for the Board to request additional information relative to the facts and issues from staff within the Department including the Office of the Judge Advocate General.[24] That was the logical office to furnish the advice requested since the statute requires the Board to

22. In Brown v. United States, 396 F.2d 989, 995 n. 15 (Ct.Cl.1968), the Court of Claims stated:
    This court has never held that a board's action is arbitrary merely because it relied on an *ex parte* statement from The Surgeon General. If, however, the statement was inaccurate and the board relied on it, we have declined to uphold the denial of relief. See, e. g., Hutter v. United States, 345 F.2d 828, 831–833, 170 Ct.Cl. 517, 524–525 (1965).
    Current Air Force Regulations make all the facilities of staff offices available to the Correction Board. 32 C.F.R. § 865.17 (b) (1971):
    *Facilities of staff offices.* The facilities of all staff offices will be made available as required to assist the Board in accomplishing its function. Upon request of the Board, personnel of the Air Staff will be made available for presentation before the Board of matters within their functional areas and which relate to the issues under consideration.

We construe facilities to include all services since the second sentence brings personnel within its scope. Army Regulations authorize its Correction Board "to call upon the Office of the Secretary of the Army, and the Department of the Army General and Special Staffs for investigative and advisory services and upon any other Department of the Army agency for assistance within the specialized jurisdiction of that agency." 32 C.F.R. § 581.3(h) (ii) (1971).

23. 32 C.F.R. § 865.1 *et seq.* (1971).

24. The Department of the Air Force regulations *currently* applicable to the "Air Force Board for the Correction of Military Records," with respect to applications for the correction of military records, provide:
    During the course of review of the case, when it appears to the Board's satisfaction that the facts have not been fully and fairly disclosed by the records or by the testimony and other evidence

be composed of *"civilians of the executive part of that military department"* [25] and they would naturally turn to their own department for assistance. In fact, it is difficult to see how they could be expected to do otherwise. Owings had been informed that such advice might be requested and we are of opinion that correct advice and information was furnished, so we find no justifiable criticism. Had the procedure or comment been incorrect or improper the remedy would have been a remand to the Correction Board for further proceeding, not a setting aside of the conviction. However, in view of the conclusion we reach hereafter this would be a useless ceremony.

## IV

■ The appellee next contends that the requisite intent for the crime of wrongful appropriation did not exist and that the Board of Review found that he never intended to deprive the Club of the payment for the slugs (actually the military payment certificates) at the time he issued the checks. This contention, however, is based on a misinterpretation of the findings and action by the Board of Review in setting aside the larceny conviction and finding Owings guilty of the lesser included offense of wrongful appropriation. Actually, the Board found that Owings lacked intent *"permanently* to deprive," as required for larceny under Art. 121(a) (1),[26] but did possess intent *"temporarily* to deprive" within the meaning of Art. 121 (a) (2).[27] This latter intent is all that is required for wrongful appropriation and it is clear from the record that the Board in its decision on review found that Owings did have such intent.

An additional point raised by Owings as a defense at his court martial was that on or about September 14, 1959, he had sent a letter to his bank rescinding his stop order of September 2, 1959. Such testimony was offered in support of his claim that he did not have the requisite intent to deprive the Club permanently or temporarily of the military payment certificates. Had this testimony been believed it would have gone a long way to support a conclusion that Owings did not intend permanently to deprive the Club of the military payment certificates, but since Owings had knowledge that he was checking on his bank

---

before the Board, the Board may require the applicant to obtain, or the Board may obtain, such further information as it may consider essential to a complete and impartial determination of the facts and issues. 32 C.F.R. § 865.12(a) (2) (1971).

25. *See* 10 U.S.C. § 1552(a), *supra* note 9.

26. *See* note 2, *supra*.

27. The decision by the Board of Review stated:

The president instructed the court members as to the essential elements of larceny, false pretense, the lesser included offense of wrongful appropriation, false pretenses in connection with the method of obtaining the property by wrongful appropriation, and in accordance with Article 51(c), Uniform Code of Military Justice. * * * The court after proper instructions was convinced beyond a reasonable doubt that the accused intended to permanently deprive the payee of each check alleged. However, we too, have to be convinced beyond a reasonable doubt that the obtaining in each instance was with the intent to permanently deprive. We have taken into account the established fact that the accused had on at least two previous occasions been successful in borrowing substantial sums of money from his in-laws and we do not believe that his story with regard to this expectation is incredible or totally unworthy of belief. In short, we believe that at the time he uttered the checks, he intended eventually to make them good. His manipulative behavior, in our view, is that of an individual who resorted to worthless checks to *temporarily* relieve his financial difficulties rather than that of one who uttered worthless checks with no intent to ever redeem them. Accordingly, we find the evidence is sufficient in law and fact to support only the findings of the lesser included offense of wrongful appropriation.

App. 38–39 (emphasis added).

without sufficient funds,[28] he could still have been found guilty of intending to temporarily deprive, etc. However, the court found him guilty of larceny so obviously they did not believe his story.

Thus both his claims that he did not possess the requisite intent for wrongful appropriation are deficient.

## V

■ Owings' principal claim on this appeal is that he was convicted for acts which are not criminal because he issued the checks to the Club "for slugs used for gambling purposes."[29] Hence, his argument goes, the checks which were given to facilitate a gambling transaction which is against public policy under United States v. Wallace, *supra*, could not furnish the basis for a criminal conviction. To do so, it is asserted, is constitutional error. However, we conclude from the entire record which was before the trial court that Owings issued all the checks to the Club in return for $850 in *military payment certificates*, not "slugs" (App. 139, 142, 174–175); that there is no question that $500 of these went to Owings' bank to pay some of his other creditors and were unconnected with any gambling transaction; that the remaining $350 in military payment certificates may have been lost in "all sorts of gambling" (App. 190), but there is some question whether over $100 of this amount was lost in slot machine gambling which was operated by the Club and in which the Club would be the direct winner of whatever was lost in such machines. Owings was also engaged in gambling at poker and dice (App. 190,

191) and one $50 check was definitely not for slot machine gambling (App. 194–195) and another check for $200 did not meet Owings' description of his slot machine checks which were issued for $25 each (App. 194). There was no testimony that the poker and dice games were house games. Some of the sum may also have gone for liquor (App. 191, 194).

### The $500 Check

With respect to the $500 check, Owings testified before the Board of Veterans Appeals on January 31, 1967 in support of his application to change the nature of his discharge, the transcript of which forms part of the trial court's record (App. 181–206), to the effect that he used the $500 to purchase a money order payable to the Clearfield State Bank, Clearfield, Utah, which he caused to be sent to that bank to cover some of his *other* checks (App. 196–198). The *other* checks were for family expenditures at the Post Exchange (PX) and the commissary (App. 193). Since Owings on September 21, 1959 (when he wrote the $500 check) had an outstanding order (dated September 2, 1959) at the Clearfield bank to stop payment on all checks payable to the Club, this stop payment order made it certain that *none* of the $500 he received on this check went to the Club for gambling or gambling losses. This diversion of the $500 he received on his check payable to the Club to his other creditors by the stop order was an intentional effort on Owings' behalf to prefer his other creditors and to make sure that the Club received none of the money (App. 190– 191, 193).[30]

---

28. Owings by letter addressed to his in-laws on September 12 or 13, 1959 had requested they deposit $1,100 in his bank account as a loan. They had assisted him previously but on October 1, 1959, advised they would not do so again. As the Board of Review found, this evidence indicated he did not intend *permanently* to deprive but does not negate an intent *temporarily* to deprive, etc.

29. Owings did not personally appear before the Correction Board.

30. I got some checks out to the PX and they are not involved in this [gambling] and if anybody is going to be hung with checks, I want the Club hung with them. That's where I lost it, that's where the gambling was and they are the ones that has got the slot machines. I don't want the PX hung with them. So, I sent the stop payment orders.
App. 190–191 (Owings' testimony).

The court martial also found by its decision that Owings in return for the $500 check had received five hundred dollars in military payment certificates (App. 174–175, and see 196–198) and thus had not received "slugs" to that extent. At oral argument on this appeal it appeared doubtful whether "slugs" or "military payment certificates" were received *in the first instance* by Owings for the checks. Owings' testimony before the Veterans Appeal Board indicates that he might have a shorthand method of describing his financial transactions in which he might ignore intervening details that he did consider to be material (App. 194–195). We considered that the finding of the court martial (App. 174–175) was determinative of the matter and that military payment certificates had been received. The trial court however apparently found that "slugs" were received, but since this would be contrary to the positive find-

ing of the court martial we were not sure whether the finding of the trial court was intended to indicate that the slugs were received *directly* in return for the checks or thereafter *indirectly, i. e.,* in return for the certificates received on cashing the checks (App. 278, 288, 297, cf. 174–175).[31] The trial court's finding would also be contrary to Owings' uncontradicted testimony that the $500 check was not lost in gambling or used to pay gambling debts (App. 196–198). There is also some question about an additional $250 in checks.

Following oral argument in this court, Owings filed a written statement admitting that he "took military script to the NCO's Slot Machine Sales & signed for each purchase [of slugs]. There was no other method of obtaining these slugs. * * * " (Emphasis added). We set out the statement in full in the margin.[32] On the basis of the unquali-

---

31. The Memorandum-Order of the District Court (App. 287–298), acting on the record before the Secretary (who was acting through the recommendation of the Correction Board) in his refusal to correct the record, found that Owings received slugs for all, or nearly all, of the checks and that they were all lost in slot machines and other gambling devices throughout the Club (App. 287–288, 297). The Memorandum-Order indicates as the basis for its conclusion: "[*T*]*he Correction Board felt and the record reflects,* on the contrary, *that all or nearly all of the proceeds of the checks were club slugs used in gambling.* * * * " (Emphasis added). Actually there is no indication whatsoever that the Correction Board so "*felt*" and there is no *factual* support in the record for such conclusion. The examiner for the Correction Board included a contention to that effect in the Summary prepared for use of the Board at the hearing under the heading "THE APPLICANT STATES" (App. 171) ; and the Correction Board in the report it made to the Secretary reiterated the substance of such statement in a paragraph which states "certain submission [*sic*] of his [Owings] have been made to the Air Force Discharge Review Board and to the Air Force Board for the Correction of Military Records" (App. 148–149). These mere recitals of the *contentions* made in

Owings' behalf do not indicate that the examiner or the Correction Board believed such contentions or adopted them. Actually the Board by its action indicated that it did not adopt such contentions. The same examiner's report also stated: "2. *The RECORD SHOWS THAT:* * * * he [Owings] *received a total of $850 in military payment certificates*" *for checks* (App. 139, 142, 174–175, emphasis added). Obviously what the record shows is to be preferred to contentions with very little practical factual support.

32. The statement filed by Owings under date of October 20, 1970 follows:
   *Plaintiffs Response Concerning Use of Slugs for Coins at NCO Club, Itazuke Air Force Base, Japan*
   Attn: The Honorable Judges Tawn [*sic*], Bobb [*sic*], & McKesson [*sic*] [Tamm, Robb and MacKinnon]
   On Tuesday, September 29, 1970, plaintiffs civil action was before this court on an appeal by the defendant of a June 23, 1969 ruling by the District Court. Plaintiff was represented in this action but was unable to appear in this court. Plaintiff learned that there was some question which involved the usage of slugs for slot machines & plaintiff understood that the judges hearing this matter wanted to know what other

fied finding of the court martial (App. 174–176) and the record as a whole, and upon Owings' admission (of which we take judicial notice),[33] we thus conclude that he received military payment certificates for all his checks. We have the same written record before us that was before the trial court and, since the district judge took no testimony, and there were no issues of credibility, we are in as good a position as the trial court to determine what inferences should be drawn therefrom.[34]

We thus find that Owings, at a time when he had ordered his bank not to stop payment on all his checks made pay-

---

goods, if any, could be obtained by using these slugs. Therefore, plaintiff herein explains the use of slot machine slugs at the NCO Club, Itazuke Air Base, Japan.

*Reason for Slug Usage*

At the time plaintiff was stationed in Japan in the Air Force, American money was not used at all. Military personnel were paid in script & there were no coins as all script including 5, 10, 25, & 50¢ was made of paper. However, the clubs had slot machines up to $1 machines so they used slugs for 5¢ 10¢ 25¢ 50¢ & $1 slot machines. These slugs were purchased with military script at the NCO Club's slot machine sales.

*Method of Slug Purchase*

To obtain slot machine slugs, plaintiff took military script to the NCO Club's slot machine sales & signed for each purchase. There was no other method of obtaining these slugs & all purchases were recorded in Club records.

*Slug Usage*

The slugs could only be used in Club slot machines & there was nothing else that the slugs could be used for. Club members could not buy food, drink, or anything with slot machine slugs because to do so would interfere with slot machine sale's record keeping procedure.

*Turning in of Slugs*

Slot machine slugs could only be turned in at the place of purchase, slot machine sales. Plaintiffs court-martial gives evidence by M/Sgt. England, Club custodian at time of plaintiff's losses, testified that "plaintiff bought over $3,000.00 more slot machine slugs than he turned in during a 9 month gambling spree." Plaintiff lost approximately $10,000.00 during spree but custodian could only verify that plaintiff was also a heavy loser at other gambling areas within Club but that only slot machine losses were recorded. The slot machine exact losses are recorded to the penny in the court-martial transcript & this gives evidence of plaintiff's assertion as supplied herein.

/s/ Robert M. Owings

33. In Benesch v. Underwood, 132 F.2d 430 (6th Cir. 1942), the appellate court took judicial notice of appellant's conviction by a court martial for desertion on the basis of an admission made at the bar of the court.

34. United States ex rel. Brown v. Smith, 306 F.2d 596, 602 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1012, 10 L.Ed.2d 11 (1963); United States v. United States Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948); Orvis v. Higgins, 180 F.2d 537 (2d Cir.), cert. denied, 340 U.S. 810, 71 S.Ct. 37, 95 L.Ed. 595 (1950); United States v. Oregon State Medical Society, 343 U.S. 326, 72 S.Ct. 690, 96 L.Ed. 978 (1952); Hunter v. Dowd, 198 F.2d 13 (7th Cir. 1952); Rowans v. Crouse, 342 F.2d 779 (10th Cir. 1965); Carroll v. Boles, 347 F.2d 96 (4th Cir. 1965). While Owings contended in his "Statement of Material Facts as to which No Genuine Issue Exists, under Rule 9" (District Court Rules) that all $850 of the checks were "given in return for slugs usable only in the Club operated by the Fund" (App. 278) the Government argued "that there is no evidence in the record to indicate that Owings used the checks or all of their proceeds for gambling" (App. 297). We know from the record that no slugs were ever received for $550 in checks. We also know that military payment certificates were received in the first instance for the remaining checks totaling $300. Of this amount, $100 of the certificates may have been immediately cashed for slugs but there is no factual showing that the $200 check was in this category. That some of this $200 may have eventually been lost in slot machine gambling after Owings used the military payment certificates in poker and dice games does not stamp that check as part of a gambling transaction. So the entire record does not support the allegation that checks totaling $850 were a direct part of any gambling transaction. In fact, the record does not support a conclusion that any amount in excess of $100 of the total was lost in the slot machines immediately after the certificates were

able to the Club, received $500 in military payment certificates from the Club on a check payable to their order, which he used to buy a money order payable in dollars to his stateside bank *to cover other checks* that were not related to gambling.[35] Such facts support a conviction for wrongful appropriation in violation of Art. 121.[36] So there is no question about 58% of the $850 covered by the seven checks was not part of any gambling transaction with the Club or with any person else.

### The Six Checks Totaling $350

As to the remaining $350 that Owings received in military payment certificates, that he received certificates for these checks takes the transaction out of the gambling character. As to what happened thereafter the best conclusion that can be reached from the

---

exchanged for slugs. We are accordingly not bound by the averment to the contrary which we know to be incorrect. A court is not bound by facts which it knows to be untrue. Young v. Boy Scouts of America, 9 Cal.App.2d 760, 51 P.2d 191, 193 (1935); Commissioners of Hendersonville v. Prudden & Co., 180 N.C. 496, 105 S.E. 7, 8 (1920); Davis v. Southern Ry. Co., 170 N.C. 582, 87 S.E. 745, 749 (1916); Graves v. Kelly, 62 Ind.App. 164, 112 N.E. 899 (1916); Russ v. City of Boston, 157 Mass. 60, 31 N.E. 708 (1892); United States v. Smith, 124 U.S. 525, 531, 8 S.Ct. 595, 31 L.Ed. 534 (1888).

35. Some of the manipulative activities by Owings in kiting checks, as summarized from the court martial record by the examiner for the Correction Board, follows:
Following a brief hospitalization after his arrival in Japan in December 1958, applicant first started playing the slot machines at the Itazuke Air Base NCO Club. On one occasion, after investing only a few slugs on a dollar machine, he hit the jackpot and that jackpot "gave me the bug." It was not until three or four months later, however, that excessive play of the machines commenced. On March 15, 1959, applicant lost all of his pay gambling and wrote his first check to finance his pastime on an account he had in a Stateside bank. It was in May 1959 that his serious difficulties began when he lost approximately $1500 gambling and began check-kiting. He would write checks knowing his account was deficient and utilize the interval involved to transmit them from Japan to the US in which to borrow money from relatives or obtain funds by selling various items of person [sic] property. Between the first of March and the middle of September 1959, "when the roof fell in," applicant considers he ran approximately $26,000 thrugh [sic] his bank account; this figure included approximately $8,500 in gambling losses, and the remainder was merely paper transactions in covering one check with the proceeds of another. Ultimately, certain checks became the basis for court-martial action against applicant when they bounced because his in-laws declined to supply him with any further money. Applicant had disposed of his automobile and all of his personal property of any significance and had become virtually bankrupt.
App. 173–174.
During the trial, it was adduced that * * * applicant made and uttered seven checks to the order of the Itazuke Air Base NCO Open Mess Fund in *varying face amounts as alleged* [Tabs 5 thru 11], that he cashed these checks at the Open Mess, and that he received a total of $850 in military payment certificates. Each of the checks was drawn on applicant's account in the Clearfield State Bank, Clearfield, Utah. When the checks were presented for payment in due course, payment was refused by the drawee bank because applicant had instructed the bank by telegram on 2 September 1959 [Tab 12] not to honor any checks payable to the Open Mess but to "accept all others." The checks were returned to the Open Mess with a notation "Payment Stopped" and the Open Mess was not reimbursed for the face amount of these checks. On 22 September 1959, applicant sent another telegram [Tab 13] directing his bank to refer all checks to the maker, to maintain a $50 balance to cover transmission and other bank charges, to wire him the balance by American Express, and to send future deposits to that account to him at Itazuke by Airmail. The bank complied on 29 September 1959 by remitting $3,884.99 to applicant in the manner requested.
App. 174–175.

36. *See* note 2 *supra.*

record is that Owings exchanged some of the certificates for "slugs" and lost a portion of the total in slot machines operated by the Club, and the remainder in some other gambling in progress at the Club and that he spent some for liquor.[37] What proportion went to each activity is not clear and the trial court made no effort to determine this. This is not vital now because, since the checks were cashed in the first instance for military payment certificates, and thereafter some of the 42% were exchanged for "slugs" at the NCO slot machines sales, the fact that some of the slugs may have been used in slot machines run by the Club does not make the issuance of the checks part of a gambling transaction with the Club. Had "slugs," which were usable only in the slot machines, been received directly for the checks, and thereafter lost completely in the slot machines, a different situation would exist since then the checks would be directly connected to a gambling transaction with the Club. There is likewise no evidence as to the extent, if any, to which the Club participated in the sums he may have lost in the other gambling games in which Owings indulged. Apparently the Club was not directly connected with the winnings and losings of the players at the poker table where the Club dealer only took a "drag" to compensate for the facilities and he was "directly not connected with the winning or the losing." (App. 195). The operation at the "crap table" was not described, i. e., whether it was a house game or not.

It is also apparent that the trial court overlooked Owings' testimony before the Veterans Appeal Board that the $25 checks were for "slugs" (App. 194). There were four such checks totaling $100. In addition, however, there was a $50 check that Owings apparently caused to be cashed at the Club for $50 in military payment certificates which were paid to an *individual* (not the Club) to whom he had lost at poker (App. 195). The $200 check does not satisfy Owings' description of the checks he gave for slugs to play the slot machines, as such checks were in $25 denominations. Its origin was not described, so there is no question about that check.

### The Gambling Decisions by the Court of Military Appeals

The District Court based its decision upon its conclusion that the Correction Board, in finding Owings guilty of an offense which under military law is allegedly not a crime, failed to recognize the effect of the *Wallace* decision. However, in addition to the fact that the $500 check was never related to any gambling transaction and the $350 in checks were issued in the first instance for military payment certificates and the record does not support a conclusion that over $100 of those went directly to slot machines, the facts in *Wallace* distinguish it from Owings' case. In *Wallace* the serviceman purchased rolls of quarters (in a foreign country—Germany) to use as slugs in the slot machines and paid for the slugs with cash, checks and I.O.U.'s. *After* he incurred his losses and the amount had become certain, he would redeem his I.O.U.'s by giving worthless checks to the winner. When these checks were returned by his bank unpaid the amount would be included on his next monthly bill at the Club. He would then give another worthless check and repeat the process. The debts evidenced by the ultimate checks were the ones that were covered by the specifications in the court marital charges. It was admitted that they were all given to cover gambling

---

37. Out of about $10,000 lost at gambling in nine months, Owings admitted "over $3,000" was attributable to slot machine losses. *See* Owings' statement of October 20, 1970, *supra* note 32. Owings was engaged in "all sorts of gambling" (App. 191); slot machines and liquor (App. 194). Before the Veterans Appeal Board Owings testified that out of total losses of $9,150 he lost $3,500 in slot machines (App. 190, 191). "I lost money at poker. I think the record shows that I won a few hundred dollars." He also testified to playing the "crap table" and "won a few dollars luckily that way. * * *" (App. 191).

debts. Thus in *Wallace* all the checks were issued *after* the amount of the debt for gambling losses had been determined. None of Owings' checks however were issued for gambling *debts*. Instead, all his checks were issued *before* any gambling and he received in exchange military payment certificates which were the same as currency. Since the certificates were so usable there was nothing in the issuance and cashing of these checks that made them part of a gambling transaction. That Owings may have subsequently exchanged some of the military payment certificates for slugs, some of which may have been immediately used in the slot machines owned by the Club, does not convert the cashing of the checks for certificates into a gambling transaction with the Club and certainly not as to the $250 that was not shown to be related to slot machine gambling. Thus the decision in *Wallace* is not controlling here.[38]

█ Another decision by the Court of Military Appeals, United States v. Lenton, 8 USCMA 690, 25 CMR 194 (1958), indicates some of the limitations on extending the gambling penalties to peripheral financial transactions. Lenton was charged with dishonorable conduct in violation of Art. 134 for issuing a worthless check for $50 and failing to make it good. The check had been given for a debt arising from receipt of an equivalent value of poker chips during two poker games. While it was obvious that such were gambling transactions, and the court so held in setting aside a guilty plea as improvident, the court also observed that:

"The accused could have contracted legitimate debts to indulge his weakness, without in any way affecting his legal responsibility for those obligations. * * *

"Unquestionably both of the alleged acts of misconduct were rooted in a gambling transaction. However, a gambler is not immunized from prosecution for an illegal act committed by him in the course of gambling. In United States v. Holt, 7 USCMA 617, 23 CMR 81, for example, we upheld, as a violation of Article 134, the accused's conviction for 'rigging' a bingo game by calling false numbers to enable a player-confederate to win. On the other hand, in United States v. Walter, supra, we held that a participant in a dice game was not chargeable with larceny, if, by means of a worthless check, he obtained 'credit' in the pot or 'cash' for deposit in the pot from the other participants. *The critical question in these cases is whether the alleged act of misconduct is part of, or separate from, participation in the illegal game.* * * * Moreover, not every money transaction between the participants in a gambling game can be considered a part of the game. *One player may ask another to cash a check, and when the request is honored he may pocket the proceeds without using any of it in the game. Then, he can hardly disclaim responsibility for the check on the ground that it is a gambling 'loss' for which he cannot be held to account. In such a situation, the check transaction is entirely separate from the gambling activity.* * * *"

United States v. Lenton, *supra,* 8 USCMA at 692–693. (Emphasis added). Also it cannot be claimed that Owings' checks were for unpaid gambling losses and hence not debts because when the checks were cashed by the Club Owings had not lost.

*Wallace* and *Lenton* thus make it clear that, had Owings defended against the

---

**38.** Owings cannot claim that a new principle of law was announced in *Wallace* because decisions of the Court of Military Appeals prior to his court martial had already recognized the principle that courts-martial will not be used to enforce gambling debts. United States v. Walter, 8 USCMA 50, 23 CMR 274 (1957); United States v. Lenton, *supra*; United States v. Young, 8 USCMA 695, 25 CMR 199 (1958). These decisions may indicate why the Court of Military Appeals declined to review Owings' case.

charges in his court martial on the ground they were gambling transactions, there was ample evidence for the court martial to conclude that the issuance of the checks for military payment certificates was separate from participation in slot machine gambling. First, there was no question about the $500 check. Secondly, in view of the fact that Owings was engaged in all forms of gambling it is most likely that of the $350 only a portion of the slugs received for the certificates went immediately to slot machines, though all may have ended up there. But, certainly if one cashes a check at the Club for his stake in a poker game, where the Club is not a participant in the winnings and losings, the maker cannot claim that it is a gambling transaction *with the Club*. *See* United States v. Lenton, *supra*. If he subsequently wins gambling with individuals, at poker, or some other form of gambling, and then later loses his winnings and the proceeds of his checks in the slot machines he cannot use the gambling defense against the check charge on the ground that he eventually lost the money in the Club slot machines or some other form of gambling. Whether a check is part of a

gambling transaction is determined at the time the check is issued and if at that time the maker received certificates which he can use as he wishes for money, to pocket or gamble in various forms, then there is nothing in that transaction that makes the payee of the check (the Club) a participant in a gambling transaction.

A further consideration which requires our consideration is that for Owings to obtain the relief he seeks would require us to sustain a collateral attack upon the judgment of a military court martial which the statute makes "final and conclusive [upon] all departments, courts, agencies, and officers of the United States. * * * " [39] However, there is superimposed upon this finality the possibility that the Secretary of the Air Force, under the statutory authority of 10 U.S.C. § 1552(a), may in a proper case correct any military record (and that includes court martial records) of that department "when he considers it necessary to correct an error or remove an injustice." [40] Likewise, the statutes provide for the establishment of boards to review discharges and dismissals, 10 U.S.C. § 1553.[41] Owings' application to

39. Art. 76, UCMJ, 10 U.S.C. § 876 provides:

The appellate review of records of trial provided by this chapter, the proceedings, findings, and sentences of courts-martial as approved, reviewed, or affirmed as required by this chapter, and all dismissals and discharge carried into execution under sentences by courts-martial following approval, review, or affirmation as required by this chapter, are final and conclusive. Orders publishing the proceedings of courts-martial and all action taken pursuant to those proceedings are binding upon all departments, courts, agencies, and officers of the United States, subject only to action upon a petition for a new trial as provided in section 873 of this title (article 73) and to action by the Secretary concerned as provided in section 874 of this title (article 74), and the authority of the President.

40. 10 U.S.C. § 1552(a). *See* note 9 *supra*.

41. 10 U.S.C. § 1553 provides:
(a) The Secretary concerned shall,

after consulting the Administrator of Veterans' Affairs, establish a board of review, consisting of five members, to review the discharge or dismissal (other than a discharge or dismissal by sentence of a general court-martial) of any former member of an armed force under the jurisdiction of his department upon its own motion or upon the request of the former member or, if he is dead, his surviving spouse, next of kin, or legal representative. A motion or request for review must be made within 15 years after the date of the discharge or dismissal.

(b) A board established under this section may, subject to review by the Secretary concerned, change a discharge or dismissal, or issue a new discharge, to reflect its findings.

(c) A review by a board established under this section shall be based on the records of the armed forces concerned and such other evidence as may be presented to the board. A witness may present evidence to the board in person or by affidavit. A person who

this Board for relief on his discharge was also denied.

In addition to such statutory review procedures, court review from unlawful confinement can always be obtained in a proper case by habeas corpus proceedings and a few recent decisions have expanded the area of permissible review to instances where the petitioner was not confined. Kauffman v. Secretary of Air Force, 135 U.S.App.D.C. 1, 415 F.2d 991 (1969), cert. denied, 396 U.S. 1013, 90 S.Ct. 572, 24 L.Ed.2d 505 (1970); Gallagher v. Quinn, 124 U.S. App.D.C. 172, 363 F.2d 301, cert. denied, 385 U.S. 881, 87 S.Ct. 167, 17 L.Ed.2d 108 (1966); Ashe v. McNamara, 355 F.2d 277 (1st Cir. 1965). The Secretary requests that we reexamine these latter decisions and hold that Owings is now limited in possible remedies to habeas corpus; but we consider such reexamination unnecessary to the disposition of this case since we find Owings' factual allegations, when examined, do not indicate any error in the court martial proceedings. Review of our own decisions would also require *en banc* consideration. So we assume, without deciding, that Owings may collaterally attack his court martial conviction but we hold that the success of such attack requires proof of a constitutional defect in the court martial proceedings. United States v. Augenblick, 393 U.S. 348, 89 S.Ct. 528, 21 L.Ed.2d 537 (1969). This is in keeping with the principles recognized in Kauffman v. Secretary of Air Force; Gallagher v. Quinn and Ashe v. McNamara, *supra*.

The foregoing considerations lead us to conclude that Owings was clearly guilty of wrongful appropriation with respect to the $500 check and that the defects, if any, with respect to the convictions for the remaining $350 do not reach constitutional proportions. At best, the claimed errors with respect to the checks for $350, since they were all issued for military payment certificates and not all were shown to have been related to gambling in which the Club was a direct participant, would only amount to an attack upon the sufficiency of the evidence to support the conviction on those checks. That is not a defect for which a court may set aside a conviction by military court martial after it has become "final and conclusive," Art. 76, 10 U.S.C. § 876. United States v. Augenblick, *supra; cf.* O'Callahan v. Parker, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed. 2d 291 (1969).[42]

### VI

It is also asserted that O'Callahan v. Parker, 395 U.S. 258, 89 S.Ct. 1683, 23 L.Ed.2d 291 (1969) prohibits these offenses from being tried by military court martial. In that case an enlisted man was convicted by a military court martial in Hawaii of attempted rape, housebreaking and assault with intent to rape. None of the offenses were committed on military property and all were committed while the accused was on authorized liberty. The Court held that such crimes were not "service connected" and "he could not be tried by court-martial but rather was entitled to trial by the civilian courts," *i. e.,* those in Hawaii. 395 U.S. at 274, 89 S.Ct. 1683. In so deciding the Court indicated it was protecting the constitutional right of an accused to the benefits of an indictment by a grand jury and a trial by a jury of his peers; that the crimes were not related to his military duties; were not committed on a military post and the person whom he attacked was not performing any duties relating to the military. The Court also noted that the situs of the crime was "not an armed

---

requests a review under this section may appear before the board in person or by counsel or an accredited representative of an organization recognized by the Administrator of Veterans' Affairs under chapter 59 of title 38.

This statute was enacted on September 7, 1962, 76 Stat. 509, and superseded the prior provisions of § 1553 (72 Stat. 1267).

42. *See* Part VI, *infra.*

camp under military control, as are some of our far-flung outposts." 395 U.S. at 273, 89 S.Ct. at 1691.

However, here we have practically all the features present that were non-existent in *O'Callahan*. The Itazuke Air Base was an armed military post and camp under military control in a foreign country far from the United States. The offenses were committed on the Air Base and against a facility performing duties relating to the military, *i. e.*, against the check cashing facility of the Club established for the convenience of non-commissioned officers and to promote their morale by making money available by check for their welfare and recreation. Also, the crimes did have a relationship to Owings' military duties since he was assigned to important security duties in counter-intelligence work and in that capacity had confidential knowledge of the counter-intelligence apparatus and he also handled money payments to informers. In that sensitive position his commission of criminal offenses always had the potential of exposing him to blackmail involving the information he possessed to the possible ultimate detriment of the military forces of the United States.

W. Winthrop, Military Law and Precedents (2d ed. 1920), in commenting on the old Sixty-Second Article, which proscribed conduct to the prejudice of Good Order and Military Discipline, stated:

> A crime, therefore, to be cognizable by a court-martial under this Article, must have been committed under such circumstances as to have directly offended against the government and discipline of the military state. Thus such crimes as theft from or robbery of an officer, soldier, *post trader*, or *camp-follower* * * * *inasmuch as they directly affect military relations and prejudice military discipline*, may properly be—as they frequently have been—the subject of charges under the present Article.

Winthrop, *supra*, at 1124–1125 (pp. 723–724, 1920 reprint) (emphasis added),

quoted with approval by Justice Douglas in *O'Callahan*. Though there have been some changes in the statutory and decisional law since Winthrop wrote, there has been no change in the rationale that people who steal or wrongfully appropriate from a "post trader" or "camp-follower," or here, from the non-commissioned officers club check cashing facility, have committed an act that directly affects military relations and prejudices military discipline. Thus, we find that the crime of wrongful appropriation of military payment certificates for which Owings was convicted and sentenced was service connected. *See generally* Relford v. Commandant, United States Disciplinary Barracks, 401 U.S. 355, 91 S.Ct. 649, 28 L.Ed.2d 102 (1971).

Reversed.