UNITED STATES

v.

**Master Sergeant Dianne EATMON, FR240–94–9996 United States Air Force.**

**ACM 32664.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 9 Jan. 1997.

Decided 28 Aug. 1997.

Appellate Counsel for Appellant: Lieutenant Colonel Kim L. Sheffield, Captain W. Craig Mullen, and Captain Earl F. Martin.

Appellate Counsel for the United States: Lieutenant Colonel Michael J. Breslin and Captain Martin J. Hindel.

Before PEARSON, MORGAN, C.H., II, and MORGAN, J.H., Appellate Military Judges.

## OPINION OF THE COURT

MORGAN, C.H., II, Judge:

Members convicted appellant, contrary to her pleas, of writing 156 checks over the course of nearly a year, with the intent to defraud, in violation of Article 123a, 10 U.S.C.A. § 923a Uniform Code of Military Justice (UCMJ), and 42 more dishonored checks, in violation of Article 134, UCMJ. Appellant was also found guilty in accordance with her pleas of using a government American Express Card for personal purposes and

of dishonorable failure to pay an American Express bill of nearly $1500 in violation of Articles 92 and 134, respectively. Members sentenced her to a dishonorable discharge, confinement for six months, and reduction to E–4. The convening authority approved the sentence as adjudged.

Appellant assigns five errors [1] for our consideration, one of which warrants extended discussion, but none of which we find entitles her to any relief.

### Facts

Appellant, while assigned to Sembach Air Base, Germany, papered virtually every government Nonappropriated Fund Instrumentality (NAFI) in the Ramstein–Sembach area with dishonored checks [2] over approximately a one year period. One hundred forty of the 155 checks charged under Article 123a were to various outlets of the Army Air Force Exchange Service (AAFES). Of these, the vast majority were uttered to the Sembach Shoppette. Three dishonored checks were to the Auto Exchange to cover the downpayment for a new car, and 12 were to the commissary. Of the 12 checks to the commissary, which constituted one specification, one was excepted by the members in their findings of guilt.

Charge II was divided into two specifications of dishonored checks in violation of Article 134. Specification 1 included two checks for $100 and $125 respectively to the Ramstein Enlisted Club in January of 1995. Specification 2 was for 40 checks, written between January 2 and March 3, 1996, to either the Ramstein or the Sembach Bowling Centers. The record reveals that appellant's squadron was deluged with telephone calls and notices from appellant's various creditors, and that she was referred to two different professional financial counselors. It further reveals that when a given bank or credit union closed her account for excessive overdrafts, she would simply open an account at another bank or credit union. When her check-cashing binges encountered a temporary hiatus because of an effective ban on check writing, or she momentarily could not find a bank to take her account, she turned to a government-issued American Express card. The practice of writing bad checks persisted well past the preferral of charges, apparently even up to the eve of trial.

### I

*Whether the Trial Judge Erred in Failing to Dismiss Specification Where Appellant Alleged Checks Were Cashed to Use in Slot Machines*

During a pretrial session, appellant moved to dismiss both specifications of Charge II, alleging that because she cashed the checks to facilitate gambling, she was protected by the holding of the Court of Appeals for the Armed Forces in *United States v. Allbery*, 44 M.J. 226 (1996). She testified on the motion in a manner which can be best described as erratic, inconsistent, and in places contradictory. The military judge, remarking that appellant was "not a particularly credible witness," denied the motion, finding that the two checks which were the subject of specification 1, made out to the Ramstein Enlisted Club in early 1995, were

---

1. I. WHETHER THE MILITARY JUDGE ERRED IN DENYING THE DEFENSE MOTION TO DISMISS SPECIFICATION 2 OF CHARGE II ON THE GROUNDS THAT THE DRAFTS THAT WERE THE SUBJECT OF THAT SPECIFICATION WERE WRITTEN TO FACILITATE GAMBLING TRANSACTIONS.
II. WHETHER THE MILITARY JUDGE'S IMPROPER INSTRUCTION TO THE MEMBERS IN THE SENTENCING HEARING AS TO THE MAXIMUM TERM OF CONFINEMENT WAS A VIOLATION OF MILITARY DUE PROCESS OF LAW.
III. WHETHER THE MILITARY JUDGE'S IMPROPER INSTRUCTION TO THE MEMBERS IN THE SENTENCING HEARING AS TO THE MAXIMUM TERM OF CONFINEMENT WAS A VIOLATION OF RCM 1005(e)(1) AND WAS NOT HARMLESS ERROR.
IV. WHETHER THE MILITARY JUDGE ERRED IN INSTRUCTING THE MEMBERS, OVER DEFENSE OBJECTION, THAT MILITARY CONFINEMENT IS CORRECTIVE RATHER THAN PUNITIVE.
V. WHETHER THE SENTENCE IS INAPPROPRIATELY SEVERE.

2. A good portion of these "checks" were actually credit union share drafts. While appreciating the subtle distinctions between the two, for purposes of simplicity we shall refer to them all as "checks."

not uttered to facilitate gambling. Appellant does not now contest this finding. She does dispute the second part of his ruling, however, wherein he found that "some" of the 40 checks in specification 2 had been cashed to put into the slot machines, but nevertheless declined to dismiss the specification or any of the checks contained within it. This, appellant insists, was error.

Some history is in order here. The seminal case upon which *Allbery* rests is *United States v. Wallace*, 36 C.M.R. 148, 1966 WL 4432 (C.M.A.1966). Assigned to a small post in Germany, Major Wallace became addicted to the slot machines at the Officers Club. A bachelor, Major Wallace was wont to frequent the club almost nightly, and nearly always gambled when he did so. Club management was not only aware of this proclivity, but fostered it, accepting Wallace's IOUs, taking post-dated checks, and rolling dishonored checks over into Wallace's club bill. Wallace himself was on the Club's Board of Governors. Over the course of time, he wrote some $7,000 in checks, a princely sum for the time, of which $2,000 went unredeemed. He was prosecuted and convicted for some 37 dishonored checks in violation of Article 134 and Article 133, UCMJ, 10 U.S.C.A. §§ 934, 933. In an opinion authored by Judge Homer Ferguson, a divided court overturned Wallace's conviction, holding that the Club could not "look to the law as 'a club to hold over those foolish enough to engage in this type of dissipation.'" *Wallace*, 36 C.M.R. at 151 (citing *United States v. Walter*, 23 C.M.R. 274, 278, 1957 WL 4479 (C.M.A.1957)).

In *Walter*, the Court had declined to enforce bad script written by a staff sergeant to cover his losses in an illegal poker game, hinging its decision on the public policy aversion to use of the courts to enforce gambling debts. *Wallace* enlarged *Walter* by discerning no meaningful distinction in the fact that the gambling in Major Wallace's case was officially sanctioned.

Looking to the public policy considerations underlying *Wallace*, and the lack of unanimity, a separate panel of this Court decided that it was no longer good law in *United States v. Allbery*, 41 M.J. 501 (A.F.Ct.Crim.

App.1994). We were promptly reversed by our superior Court whose four different opinions agreed on only one thing—even if *Wallace* were no longer good law, we were not the ones to say so. Only two of the opinions agreed that *Wallace* was still vital, a third declined to address it, and two more believed it was ripe for reversal.

The important thing to remember about *Wallace* and *Allbery* is that in both instances it was conceded that all or nearly all of the checks at issue had been to pay for gambling. *Wallace*, 36 C.M.R. at 149 n. 1; *Allbery*, 41 M.J. at 501–502. In both cases, as well, it is clear that the government was at the very least fully cognizant of the appellants' intention to use the checks to play the slots, and, if it did not actively abet that intention (as in *Wallace*), it certainly did nothing to prevent it (as in *Allbery*).

Therein lies a crucial distinction. According to the factual findings of the military judge, which we will respect unless they are without support in the record, appellant was on a "bad-check list" during all or most of the time she was cashing the checks at the two bowling centers. She acknowledged as much in her testimony. Thus, she should not have been able to cash checks at all at either facility. She admitted that she had a "friend" who worked at the Ramstein Bowling Center, and who disregarded the prohibition and cashed her checks anyway. She was herself employed part-time as a cashier at the Sembach Bowling Center, and thus was in a position to cash her own checks. She also testified that she had another "friend" at the Sembach Bowling Center who cashed her checks for her.

Furthermore, there was testimony that the standard practice of NAFI management at both bowling alleys, and elsewhere, was to have the cashier initial the check. Yet, of 40 checks which are the subject of specification 2 of Charge II, only 3 had any initials at all. Taking all of this together, we do not think it was an abuse of discretion for the military judge to decide, as he did, that the government not only did not abet appellant's check-writing practices, but had taken affirmative steps to abate it—steps appellant deliberately circumvented. This is a critical, and in

our view, dispositive distinction between this case and *Wallace–Allbery*. Accordingly, we decline to disturb appellant's conviction for either of the two specifications under Charge II.

## II and III

### Instructions on Sentencing

■ Appellant argues that the judge erred when he instructed the members that the maximum sentence to confinement for her convictions was 222 years. She did not object to this during trial, however, agreeing that the military judge was correctly applying the calculus of *United States v. Mincey*, 42 M.J. 376 (1995). Hence, we will not contend with the disputed instructions unless they were plain error. R.C.M. 1005(e)(1). We do not find error, much less plain error.

Appellant contends that, as a constitutional matter, over 200 years confinement for bad checks transgresses the proportionality component of the Eighth Amendment, or that, in some fashion, it offends military due process. We need not and do not decide that question, because it is hypothetical. All of the Supreme Court precedents appellant cites deal with *adjudged* sentences, not the *potential* maximum. Had appellant actually been sentenced to 222 years, we betray no judicial confidences to predict our intervention to meliorate that sentence in satisfaction of our responsibility under our Article 66(c), 10 U.S.C.A. § 866(c) to approve only an appropriate sentence. *See also United States v. Snelling*, 14 M.J. 267 (C.M.A.1982). But she did not get 222 years confinement; she got six months. Appellant's quarrel, assuming *arguendo* she has standing to make it, is with *Mincey*, which neither we nor the military judge have the power to amend, much less do we err when we follow it.

## IV

### Whether Military Judge Erred in Describing Confinement as Corrective and Not Punitive

■ Appellant next objects to the following instruction:

A sentence to confinement is governed by and served under the Department of Defense Corrections Program. Military confinement is corrective rather than punitive. Prisoners perform only those types of productive work which may be required of duty airmen. The confinement and correction program is intended to help individuals solve their problems, correct their behavior and improve their attitude toward themselves, the military, and society.

At an Article 39(a), 10 U.S.C.A. § 839(a) session held to discuss sentencing instructions, the defense counsel objected to this language, arguing that it misled members into believing that confinement was "like summer camp is." Counsel sought to replace the second sentence above with "Military confinement is designed or is (*sic*, "or is" should be "as") punishment and not for punishment," referring to the language approved in the since-superseded Air Force Manual 111–2, *Court–Martial Instructions Guide*, 15 October 1971. That manual, of course, was superseded by Department of the Army Pamphlet 27–19, *Military Judges' Benchbook*, the most recent version of which is dated 30 September 1996. The *Benchbook* contains no similar language. The instruction at issue in this case, although not lifted verbatim from Department of Defense Directive 1325.4, *Confinement of Military Prisoners and Administration of Military Correctional Programs and Facilities*, May 19, 1988, appears aimed at capturing its tone.

First of all, we reject the government's contention that appellant waived the issue simply because she failed to object to the instruction as the judge gave it or afterwards, when the judge asked if there were any objections to his instructions. Defense counsel, as he should, voiced his objection and proposed his substitute language out of the members' hearing, at a session convened for that very purpose, before instructions were given. The military judge considered counsel's arguments, overruled his objection, and declined to employ the substitute language. Interrupting the military judge as he delivered the instruction, or afterwards before the members, to reiterate an objection already ruled upon on the record, would have been discourteous at the very least, if not

unprofessional. Certainly it was unnecessary to preserve error in this case.

■ However, we disagree with appellant's argument that the instruction was error. Granted, it is not a "standard" instruction in the sense that it is not contained in the *Benchbook*. But judges are not chained to a script, particularly in giving instructions. A military judge's instructions are examined as a whole to ensure that they are fair, complete, not misleading, and do not prejudice either side. Summarizing the Department of Defense philosophy governing its confinement facilities did not mislead the members, nor could it anaesthetize them to the severity of a sentence to confinement. Court-martial members are neither children nor dullards. We doubt any were in the slightest lulled into the belief that they were sending appellant away to summer camp for six months.

*V*

### Sentence Severity

■ Finally, appellant attacks the severity of her sentence, particularly the dishonorable discharge, which she avers should be reserved for rapists and murderers, and those "who through a course of conduct [demonstrate] a complete and utter disregard for society's norms." We think the latter description fits nicely to appellant's situation. Although non-violent, her behavior as it was unveiled through a litigated trial revealed a remorseless pattern of deception, dishonesty, and manipulation. The government bent over backwards, time and again, to accommodate what appellant always depicted as transitory financial distress. It provided her financial counseling, helped her to build budgets, and even gave her free food. Each time she rewarded her unit's efforts by the surreptitious establishment of a new check-

ing account and a reversion to her old patterns, including the use of insiders to defy check-cashing prohibitions (her financial counselors, who thought they had her on the road to fiscal health by closing her checking accounts, were not told that she was again writing checks). Neither are we persuaded that her problem was gambling. The vast majority of her bad checks were cashed at AAFES facilities that had nothing to do with gambling. She bought a new car, bouncing three bad checks for the down payment, when she was still thousands of dollars in debt and against the strenuous advice of her financial counselors. The "diagnosis" she submitted to cast the blame on her being a compulsive gambler actually shows her to be a compulsive spender. *United States v. Healy*, 26 M.J. 394 (C.M.A.1988).

We are persuaded, therefore, that members appropriately took into consideration appellant's crimes, balanced them against her 14 years of otherwise good service, and fashioned a sentence they believed appropriate to both. It was not inappropriately severe.

### Conclusion

On the basis of our review of the record, the pleadings and arguments of counsel, we hold the findings to be correct in law and fact, the sentence is not inappropriately severe, and the same are hereby

AFFIRMED.

Senior Judge PEARSON and Judge J.H. MORGAN concur.