## UNITED STATES, Appellee

v

## ROBERT G. WALLACE, Major, U. S. Army, Appellant

### 15 USCMA 650, 36 CMR 148

No. 18,811

January 28, 1966

*Captain Frank J. Martin, Jr.*, argued the cause for Appellant, Accused. With him on the brief were *Colonel Joseph L. Chalk* and *Lieutenant Colonel Jacob Hagopian.*

*Captain Joseph H. Crosby* argued the cause for Appellee, United States. With him on the brief were *Colonel Joseph J. Crimmins* and *Lieutenant Colonel Francis M. Cooper.*

### Opinion of the Court

FERGUSON, Judge:

Arraigned and tried before a general court-martial convened at Munich, Germany, the accused was found guilty of four specifications of wrongfully and dishonorably failing to place and maintain sufficient funds on deposit in his bank account to meet the payment of specified checks upon their presentment, in violation of Uniform Code of Military Justice, Article 134, 10 USC § 934, and a single specification of wrongfully, deceitfully, and dishonorably making and uttering thirty-three checks to the Officers Open Mess, Murnau, Germany, and thereafter dishonorably failing to maintain sufficient funds on deposit to pay such instruments on presentment, in violation of Code, supra, Article 133, 10 USC § 933. He was sentenced to be dismissed from the service. The convening authority approved the penalty, but the board of review commuted it to a forfeiture of $100.00 per month for nine months, otherwise affirming. We granted accused's petition for review upon issues dealing with the sufficiency of the evidence and the denial of certain instructions requested by the defense counsel. We need, however, deal only with the question of sufficiency.

650

## I

The record discloses a truly astonishing situation. Major Wallace, an officer whose previous service had been outstanding in every respect, was assigned to a responsible position in an organization located at Murnau, Germany. A bachelor, he resided in the Bachelor Officers' Quarters and frequented the Officers' Club. As permitted by a U. S. Army, Europe, directive, the Club possessed and placed in its bar several slot machines. Previously unfamiliar with such devices, the accused became fascinated by them and indulged himself as one of the heaviest, if not the heaviest, player in the organization. In fact, the Club custodian described his participation in the following manner:

"Q. Did he ever give money to the Club—donate money to the Club?

"A. The way he played the slot machines, sir, I would say yes."

As the machines were set to return only thirty cents of every dollar deposited in them, there is justification for the observation. Indeed, it appears that, as a result of the accused's penchant, the Club enjoyed its most prosperous year.

Between April 1, 1963, and January 1964, the accused wrote approximately $7,000.00 in checks to the Club. Some $5,000.00 of these were honored by his bank, located in the United States. The balance were returned unpaid to the Club and form the basis of the charges against him. The proceeds of the unpaid checks and the bulk of those duly honored on presentment were placed in the Club's slot machines.[1]

According to the transcript, the normal procedure followed by the accused and the Club was as follows. Accused would purchase rolls of quarters kept for that purpose at the Club bar. He would either pay for them by cash, check, or I.O.U. The quarters would be played in one of the machines. If accused won, he returned his winnings

to the device. If he lost, he procured more quarters and continued to play.

Accused normally redeemed his I.O.U. at the end of the evening or later from the Club manager by giving a check in its place. When checks were returned unpaid by his bank, they were billed to him on his monthly account. Upon such occasions, he replaced the dishonored checks with one for their total face value. When this, along with others, was dishonored, he would replace it with a larger check, and so on, until the end of the period involved. Though accused had no agreement as such with the Club, the Board of Governors, of which he was a member, was aware of the procedure which he used, as were other Club personnel. All were confident, in light of accused's character, that the Club would eventually be paid. In fact, when an audit of the Club books disclosed to the local Commander the extent of the accused's obligation, and he brought such to accused's attention, the debt was immediately satisfied.

## II

Based on the foregoing, the Government argues that, as use of slot machines in United States Army, Europe, Clubs is legal, the fact accused's checks were written to facilitate a gambling game is immaterial. Hence, it urges the failure to maintain funds on deposit to pay such obligations upon presentment was dishonorable conduct and suffices to support the findings of guilty. We disagree.

Whether the use of slot machines in American military establishments abroad is legal, we need not and do not decide. Cf. United States v Whitson, 14 USCMA 324, 34 CMR 104. Whether gaming is legal or illegal, transactions involving the same or designed to facilitate it are against public policy, and the courts will not lend their offices to enforcement of obligations arising therefrom.

Thus, in Berman v Riverside Casino

---

[1] There is some intimation that the returned checks also possibly involved small bar or mess bills, but the Club bookkeeper testified he could not recall that accused's checks covered these. He either paid by check "Or he paid his by cash. I don't know." The Government does not contend here that the checks involved anything other than monies with which to play the slot machines.

Corporation, 323 F2d 977 (CA 9th Cir) (1963), it was pointed out that, although gambling is legal in Nevada, the courts of that State deny any right of recovery on gaming transactions. The same is noted in Scott v Courtney, 7 Nev 419 (1872); West Indies v First Nat. Bank of Nevada, 67 Nev 13, 214 P2d 144 (1950); and Weisbrod v Fremont Hotel, Inc., 74 Nev 227, 326 P2d 1104 (1958).

In the *West Indies* case, as here, dishonored checks were involved in payment of gambling debts. The Supreme Court of Nevada refused to permit suit for their collection, although conceding state statutes permitted licensed gambling and imposed a tax thereon. In *Weisbrod,* supra, the court declared action by a winner against the defaulting proprietor of a keno game would not lie, saying, "The dispute here involved is not one of which judicial cognizance can be taken." *Weisbrod,* supra, at page 1105.

So also in Hamilton v Blankenship, 190 A2d 904 (DC CA) (1963), recovery was denied for money loaned by a licensed Maryland proprietor of slot machines, such, as here, being advanced "in the form of coins to enable appellee to play the slot machines maintained there." The Court of Appeals found that a gambling transaction could not form the basis of suit in Maryland, although this form of gaming was legal there. It also pertinently noted the applicable general rule, at page 904, to be as follows:

"Ordinarily a contract valid where made will be enforced in the courts of another jurisdiction without regard to whether it would have been valid under the law of the forum. *Exception is made to the general rule when enforcement of the contract would contravene the public policy of the forum."* [Emphasis supplied.]

See also the cases collected in Annotation, 53 ALR2d 345; 24 Am Jur, Gaming and Prize Contests, § 61; and 38 CJS, Gaming, §§ 4, 29.

In like manner, this Court has, on the basis of public policy, consistently refused to sustain criminal proceedings based upon the issuance of worthless or subsequently dishonored checks in connection with gambling games. Thus, in United States v Walter, 8 USCMA 50, 23 CMR 274, we declared, at page 53:

"It is clear from what we have said above that gambling is against public policy and that the subjects of the alleged larceny were engaging in this illegal activity with the accused. . . . We will not act as the 'strong arm' of a collection scheme for gamblers within the service in order to intimidate payment by 'debtors' of void gambling debts. The fact that one 'welshes' on his gambling debts and becomes known as a 'welsher' is not a crime."

Again, in United States v Lenton, 8 USCMA 690, 25 CMR 194, we held a guilty plea to check and debt offenses improvident because they arose out of a gambling transaction. Of such, we said, at page 693:

". . . [H]owever deliberate and willful the refusal to pay, nonpayment of a gambling obligation is not the nonpayment of a 'debt,' regardless of whether the term is limited to a legal obligation to pay a sum of money, or is interpreted in the more general sense of a 'moral' obligation which is not enforceable by court action. . . . There is no 'moral' obligation in a gambling debt. As the Supreme Court of California said in Schur v Johnson, 2 Cal App 2d 680, 38 P2d 844, gambling is 'in conflict with the welfare and morals of society.'"

Turning to the check offense, we went on to state:

". . . There must be *dishonorable* conduct on the part of the accused as well as nonpayment of the check. . . . Refusal to make good on an instrument which is valid neither legally nor morally can hardly be regarded as dishonorable conduct. Lacking any obligation to pay, the accused's conduct in not making good on a check, under such circumstances, is not dishonorable."

See also United States v Young, 8 USCMA 695, 25 CMR 199; and United States v Dosal-Maldonado, 12 USCMA

442, 31 CMR 28; and United States v Brown, 13 USCMA 485, 33 CMR 17, the latter cases holding "one does not steal when he effects the recaption of money he has lost in a crooked gambling game."

The sum of these cases is that the issuance of a worthless check in a gambling game or as a means of facilitating a gaming transaction cannot be made the basis of a criminal prosecution for allegedly "dishonorable" conduct, as here charged. As we have seen above, judicial cognizance of such prosecutions is denied, whether the game be illegal or legal. And there can be no doubt that the checks here involved were issued to the Club to facilitate accused's play of its gambling devices, and were not, therefore, "check transaction[s] . . . entirely separate from the gambling activity." United States v Lenton, supra, at page 693.

One cannot deposit a check in a slot machine. It is necessary to use coins for that purpose, rolls of which were here given the accused by the Club bartender in return for his checks, such rolls being maintained on hand for that use and the accused, in fact, so using them. See, Annotation, supra, 53 ALR 2d 345, 372; Russo v Mula, 49 So 2d 622 (La) (1950); Lavick v Nitzberg, 83 Cal App 2d 381, 188 P2d 758 (1948); and Braverman v Horn, 88 Cal App 2d 379, 198 P2d 948 (1948). As was stated by the Supreme Court in Embrey v Jemison, 131 US 336, 33 L ed 172, 9 S Ct 776 (1889), at page 347:

". . . [W]e are of opinion that, upon principle, the original payee cannot maintain an action on a note the consideration of which is money advanced by him upon or in execution of a contract of wager, he being a party to that contract, or having directly participated in the making of it in the name of or on behalf of one of the parties."

The case here also is nonetheless gambling, although one of the parties to the wager is an instrumentality of the United States. Gaming is almost universally recognized as *contra bonos mores*. Irwin v Williar, 110 US 499, 28 L ed 225, 4 S Ct 160 (1884). And this is so, even if it is assumed to be legal where played. West Indies v First Nat. Bank of Nevada, supra; Burke v Buck, 31 Nev 74, 99 Pac 1078 (1909). We will not, therefore, lend the offices of the criminal law to the taking of punitive measures for the nonpayment of gambling obligations. United States v Walter; United States v Lenton, both supra. As we observed in *Walter*, supra, at page 54, the Club "gambled on the accused having money in the bank and lost." Having done so, it cannot look to the law as "a club to hold over those foolish enough to engage in this type of dissipation." United States v Walter, supra, at page 54. We find the evidence legally insufficient to support the court-martial's conclusion that accused engaged in dishonorable conduct.

The findings of guilty and sentence are set aside. The decision of the board of review is reversed, and the record of trial is returned to The Judge Advocate General of the Army. The charges are ordered dismissed.

Judge KILDAY concurs.

QUINN, Chief Judge (dissenting):

Although I have no special knowledge relating to morals and ethical conduct, I am sure that all gambling is not so morally wrong that society cannot tolerate it in any of its manifold forms. Basically, insurance presents a risk that is characteristic of gambling, particularly the "one shot" type, such as that against rain on the day of a big event. Yet insurance is economically necessary, socially desirable, and almost from its beginning has received judicial sanction as a legally and morally enforceable transaction. Similarly, in recent years, churches of many faiths, veterans organizations, and various charitable institutions and social groups have conducted bingo games and sponsored raffles. Speculation in the stock and grain markets is lawful; and betting at parimutuel tracks is well established. With so many and so diverse elements of society publicly participating in these legally sanctioned forms of chance-taking for profit, it can hardly be argued that all gambling is contrary to public policy. Consequently, I disagree with the majority's conclusion

**653**

that playing a slot machine, where not prohibited by law, is contrary to the good morals and the public policy of the military community. I would not, therefore, reverse the accused's conviction on the ground that the transaction underlying the checks is illegal.

As to the instructions, there is, in my opinion, merit in the accused's contention that the law officer erred in refusing to instruct, as requested by defense counsel. In part, the accused's defense rested on a claim that the checks were given to the club with the understanding they could be deposited for collection but not all might be paid on presentment. The club bookkeeper admitted that on at least one occasion when the accused gave him a check he told him, "[m]aybe this check will bounce, too." He testified that *he* "took it as a joke," but there is other evidence to support the defense contention that the checks were not accepted as ordinary commercial instruments. The bookkeeper conceded that, notwithstanding the regulations forbid the taking of IOUs from club members, such instruments were readily and frequently accepted from the accused; and these IOUs would be replaced by a check. Defense counsel requested an instruction on this aspect of the evidence. The language of the request may not have been as explicit as it should have been, but it was supported by a citation to United States v Mansfield, 22 CMR 667, which discussed the principle of law that he sought to place before the court-martial. It was sufficient to put the law officer on notice, and required that he instruct the court-martial that, to find the accused guilty as charged, it had to be satisfied beyond a reasonable doubt that the checks were accepted by the club as ordinary commercial instruments, and not as IOUs, or mere memoranda of the accused's indebtedness to the club.

I would reverse the decision of the board of review and return the record of trial for a rehearing.