UNITED STATES, Appellee,

v.

Dianne EATMON, Master Sergeant,
U.S. Air Force, Appellant.

No. 98–0068.
Crim.App. No. 32664.

U.S. Court of Appeals for
the Armed Forces.

Argued June 3, 1998.

Decided Sept. 29, 1998.

For Appellant: *Captain Tishlyn E. Taylor* (argued); *Colonel Douglas H. Kohrt, Captain W. Craig Mullen,* and *Captain Earl F. Martin (USAFR)* (on brief).

For Appellee: *Captain Martin J. Hindel* (argued); *Colonel Brenda J. Hollis* and *Lieutenant Colonel Michael J. Breslin* (on brief).

*Opinion of the Court*

SULLIVAN, Judge:

During January of 1997, appellant was tried by a general court-martial composed of officer members at Ramstein Air Base, Germany. On mixed pleas, she was found guilty of failure to obey a general regulation concerning proper use of her government American Express card; making and uttering 156 bad checks; dishonorable failure to maintain funds to cover 42 checks previously written; and dishonorable failure to pay a just debt, in violation of Articles 92, 123a, and 134, Uniform Code of Military Justice, 10 USC §§ 892, 923a, and 934, respectively. She was sentenced to a dishonorable discharge, confinement for 6 months, and reduction to E–4. On April 8, 1997, the convening authority approved this sentence. The Court of Criminal Appeals affirmed. 47 MJ 534.

On January 14, 1998, this Court specified the following issue for review:

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF APPELLANT WHEN HE REFUSED TO INSTRUCT THE MEMBERS THAT THEY SHOULD FIND APPELLANT NOT GUILTY OF SOME OR ALL OF THE BAD DRAFTS ALLEGED UNDER SPECIFICATION 2 OF CHARGE II IF THEY CONCLUDED THAT THE UNDERLYING OBLIGATION REPRESENTED BY THE DRAFTS IN THAT SPECIFICATION WAS VOID *AB INITIO. SEE UNITED STATES V. ALLBERY,* 44 MJ 226 (1996).

We hold that the military judge did not err in this case because appellant was not entitled to dismissal of her dishonored-check offenses (Charge II) under this Court's decisions in *United States v. Allbery, supra,* or *United States v. Wallace,* 15 USCMA 650, 36 CMR 148 (1966). *See generally United States v. Lenton,* 8 USCMA 690, 693, 25 CMR 194, 197 (1958); *see also Carnival Leisure Industries, Ltd. v. Aubin,* 830 F.Supp. 371 (S.D.Tex.1993).

The court below summarized the relevant facts as follows:

> Appellant, while assigned to Sembach Air Base, Germany, papered virtually every government Nonappropriated Fund Instrumentality (NAFI) in the Ramstein–Sembach area with dishonored checks[1] over approximately a one year period. One hundred forty of the 155 checks charged under Article 123a were to various outlets of the Army Air Force Exchange Service (AAFES). Of these, the vast majority were uttered to the Sembach Shoppette. Three dishonored checks were to the Auto Exchange to cover the downpayment for a new car, and 12 were to the commissary. Of the 12 checks to the commissary, which constituted one specification, one was excepted by the members in their findings of guilt.

---

[1] A good portion of these "checks" were actually credit union share drafts. While appreciating the subtle distinctions between the two, for purposes of simplicity we shall refer to them all as "checks."

> *Charge II was divided into two specifications of dishonored checks in violation of Article 134.* Specification 1 included two checks for $100 and $125 respectively to the Ramstein Enlisted Club in January of 1995. Specification 2 was for *40 checks,* written between January 2 and March 3, 1996, to either the Ramstein or the Sembach Bowling Centers. The record reveals that appellant's squadron was deluged with telephone calls and notices from appellant's various creditors, and that she was referred to two different professional financial counselors. It further reveals that when a given bank or credit union closed her account for excessive overdrafts, she would simply open an account at another bank or credit union. When her check-cashing binges encountered a temporary hiatus because of an effective ban on check writing, or she momentarily could not find a bank to take her account, she turned to a government-issued American Express card. The practice of writing bad checks persisted well past the preferral of charges, apparently even up to the eve of trial.

47 MJ at 536 (emphasis added).

Prior to entering a plea, the defense moved to dismiss Charge II and its specifications on the ground that the checks contained in that Charge were written for the purpose of obtaining money to be used for slot machine gambling in an on-base facility. Counsel cited *United States v. Allbery* and *United States v. Wallace,* both *supra.* In support of the motion, appellant testified that, with regard to specification 1, she was "pretty sure" she wrote those two checks to receive cash for gambling, but she was not certain. With respect to the second specification under the same Charge, appellant testified that she used the cash from those checks to gamble in slot machines at the bowling alleys on Ramstein and Sembach Air Bases. The military judge denied the defense motion.

Defense counsel then requested the military judge to give an instruction to the members regarding application of *Allbery* to this Charge. He suggested that members be instructed that they must decide whether the checks were used for gambling as a matter of fact, and if they were, they must find appellant not guilty of this offense. The military judge denied this request, but the defense renewed it at the close of findings. The military judge again declined to provide the requested instruction and ultimately entered the following findings of fact:

> 1. In the two specifications of Charge II, the accused is charged with writing two checks, to the Ramstein Enlisted Club, and 40 drafts, to the bowling centers at Ramstein and Sembach, and then dishonorably failing to maintain sufficient funds in her account to pay them upon presentment.

2. The accused made and uttered all 42 of the checks and drafts as alleged.

3. The Ramstein Enlisted Club and the bowling centers at Ramstein and Sembach Air Bases have slot machines. Some of the slot machines accept quarters, others accept bills.

4. *Neither of the two checks uttered to the Ramstein Enlisted Club were for the purpose of obtaining money for the slot machines.*

5. *Some, but not all of the drafts uttered to the Ramstein and Sembach Bowling Centers were for the purpose of obtaining money with which to gamble.* At times the accused received quarters, at other times she received bills.

6. The accused was employed on a part-time basis, as a recreation aide, at the Sembach Bowling Center. At times she worked as a cashier and cashed checks. She was aware of a bad-check list and that she was on it.

7. With the assistance of friends who worked at the bowling centers and cashiers who failed to check the bad-check list, the accused was able to cash checks even though she knew that her name was on the bad-check list and she was not supposed to be writing checks at those facilities.

8. The accused appears to suffer from an impulse control disorder due to compulsive spending.

9. There is no evidence that the management of any of the establishments in which the accused gambled was aware that [the] accused was cashing these checks for gambling or actively encouraged this accused to continue to gamble.

(Emphasis added.)

The military judge also made the following conclusions of law:

1. When asked if there were any "requests for additional instructions," the following ensued:

> DC: No, Your Honor. A request for additional instructions, no objections to those instructions, Your Honor. However, the defense, again, renews our request that you instruct the court members pursuant to *United States v.*

* * *

5. The basis for the *Wallace* decision seemed to be that the club was encouraging a naive officer to continue to gamble despite their knowledge that his gambling was causing deep financial problems. Under those circumstances, the Court was unwilling to accept that his continuing to gamble amounted to dishonorable conduct. The *Allbery* decision is less helpful. The Court was divided on whether the *Wallace* decision was correct and whether the circumstances were the same. Here, the facts are considerably different. There is strong evidence from which the court members could conclude that the accused's conduct was dishonorable. The management of the club and bowling centers put her name on a bad-check list in an effort to keep her from uttering bad-checks. The accused circumvented those efforts by waiting until she found a clerk who was not checking the bad check list or by cashing checks when the cashier on duty was a friend.

[H]ad any evidence whatsoever come to light that the management was actively encouraging the accused to gamble and that they knew that was the purpose for which she made and uttered the checks and drafts, and [sic] instruction may have been necessary. However, no such evidence was presented.

Appellant was found guilty, contrary to her pleas, of the two specifications of dishonorably failing to maintain funds to cover her checks. On appeal to this Court, appellant attacks the military judge's refusal to provide the defense-requested instruction. More specifically, appellant contends that she was entitled to an "*Allbery* instruction" because the evidence in her case shows she used the cash proceeds from the charged checks to gamble.[1]

> *Allbery,* that evidence of gambling has been presented, and if they find that there has been no evidence to the contrary, and if they find that the evidence is that Sergeant Eatmon gambled that money that she wrote those checks out for and charged to, that they must find her not guilty.
>
> MJ: Your request is denied.

Article 134 and paragraph 68b, Part IV, Manual for Courts–Martial, United States (1995 ed.), prohibit making bad checks and the dishonorable failure to maintain funds to cover them. A judicial limitation on this offense with respect to checks written to acquire funds for legalized gambling was first recognized[2] by the decision of this Court in *United States v. Wallace,* 15 USCMA 650, 36 CMR 148 (1966). In *Wallace,* the accused had written approximately $7,000.00 in checks to an Officer's Club. Nearly $5,000.00 of these checks were honored, but the "balance were returned unpaid to the Club.... The proceeds of the unpaid checks and the bulk of those duly honored on presentment" were used by Major Wallace to play "the Club's slot machines." *Id.* at 651, 36 CMR at 149.

In a divided opinion (2–1), Judge Ferguson, writing for a majority of the Court, stated:

[W]hether gaming is legal or illegal, transactions involving the same or designed to facilitate it are against public policy, and the courts will not lend their offices to enforcement of obligations arising therefrom.

*Id.* at 651, 36 CMR at 149. His opinion further suggests that Major Wallace's only misconduct was that he failed to maintain sufficient funds in his account to cover his previously written gambling checks to the officer's open mess. The majority then held that *this evidence was legally insufficient to show that Major Wallace engaged in dishonorable check practices* in violation of Article 134. *Id.* at 653, 36 CMR at 151.

Three decades after *Wallace,* this Court decided *United States v. Allbery,* 44 MJ 226 (1996). In *Allbery,* the accused had cashed, "in less than one month's time, ... 21 checks

totalling $2500 at the Ramstein Enlisted Club. All of the checks were cashed in the club's 'game room.' ... [I]n return for the checks, the cashier" would give the accused "'rolls of quarters,' all of which he then promptly put into the slot machines in the game room." *See id.* at 230. The checks were dishonored upon presentment, and Airman Allbery was found guilty of "making and uttering worthless checks by dishonorably failing to maintain sufficient funds" in an account, in violation of Article 134. 44 MJ at 227.

The Court of Criminal Appeals affirmed Airman Allbery's conviction. 41 MJ 501 (1994). It held that, in its view, "legal gambling" was no longer "against public policy" (*id.* at 502) and refused to follow this Court's *Wallace* decision because it was deemed outdated. This Court then produced four separate opinions on its review of *Allbery.* *See* 44 MJ at 227, 230, 231. One general point of agreement, however, was that, even if the court below believed *Wallace* was no longer good law because of a change in public policy toward gambling, that court erred in refusing to follow the precedent of its higher appellate tribunal. 44 MJ at 228, 230, 231; *see generally United States v. Jones,* 23 MJ 301 (CMA 1987). Otherwise, however, the members of this Court disagreed.

A plurality consisting of Senior Judge Everett and Chief Judge Cox held that Airman Allbery's conduct "was not distinguishable from the facts of *Wallace* in any meaningful sense." Observing that they were "unconvinced that the public policy in question has changed discernibly since *Wallace* was announced," 44 MJ at 227, the judges in this plurality then applied *Wallace* to Airman Allbery's case and voted to set aside his conviction. *See id.* at 230. One other judge

---

**2.** *United States v. Wallace,* 15 USCMA 650, 36 CMR 148 (1966), has been generally referred to as the seminal case with regard to this Court's approach to conduct involving *legal* gambling. Prior to *Wallace,* the Court had, on public-policy grounds, consistently refused to uphold criminal convictions based upon *illegal* gambling activity by an accused. *See, e.g., United States v. Walter,* 8 USCMA 50, 54, 23 CMR 274, 278 (1957) (dismissing larceny charge and stating: "We will not

act as the 'strong arm' of a collection scheme for gamblers within the service in order to intimidate payment by 'debtors' of void gambling debts."); *United States v. Lenton,* 8 USCMA 690, 693–94, 25 CMR 194, 197–98 (1958) (setting aside guilty pleas to check and debt offenses because they arose out of an illegal gambling transaction); *United States v. Young,* 8 USCMA 695, 25 CMR 199 (1958).

distinguished *Allbery* on its facts and also suggested that he might "prospectively over-rule" *Wallace*. *See* 44 MJ at 230 (Sullivan, J., concurring in part and dissenting in part). The two remaining judges (Crawford, J., and Gierke, J.) voted to reverse Allbery's conviction on the basis that *Wallace* was good law, at least at the time of Allbery's offenses, but declined judgment on its future viability. *Id.* at 230–31.

Appellant contends that this Court should also set aside her convictions for dishonorable check-making because our decision in *Allbery* established a general gambling limitation on, or defense to, bad-check offenses in the military. The Government responds, however, that appellant's case is distinguishable from *Allbery* and *Wallace,* and that accordingly, the military judge properly declined to dismiss this case or grant the defense-requested instruction. We agree with the Government.

In resolving the above question, we first note that *Allbery* is not the most appropriate authority for evaluating appellant's legal claim to a gambler's defense in her case. As noted above, *Allbery* did not produce a clear majority recognizing a gambling limitation on dishonorable check offenses in all cases regardless of the circumstances. *See* 44 MJ at 230–31. Appellant's complaint is more appropriately raised under *Wallace,* which was followed in *Allbery* and which recognized such a limitation or defense *in certain factual circumstances. See United States v. Allbery, supra* (separate opinions of the judges). Therefore, we turn to *Wallace* to determine whether appellant was entitled to dismissal of the charges or the requested gambler's defense instruction.

In *Wallace,* a majority of this Court held that the evidence offered to show his guilt of dishonorable check writing, in violation of Article 134, was legally insufficient in light of the public policy against gambling. 15 USCMA at 653, 36 CMR at 151. We note, however, that it was shown in *Wallace* that the club management was aware of Major Wallace's numerous bounced checks and even facilitated his gambling activity. *See id.* at 651, 36 CMR at 149. Such "cultivation or condona-tion" of an inexperienced gambler might logically suggest that Major Wallace's conduct was not dishonorable within the meaning of Article 133, UCMJ, 10 USC § 933, and Article 134. *Cf. Allbery,* 44 MJ at 230 (Sullivan, J., concurring in part and dissenting in part). In any event, the opinion also makes clear that the accused acquired these gambling funds from the Officer's Club in an otherwise lawful manner in accordance with normal club procedures. *See Wallace, supra* at 651, 36 CMR at 149.

Turning to appellant's case, we find that a far different evidentiary record exists with respect to the issue of dishonorable conduct. First, the military judge found as fact that the service club management did not abet her check writing abuse as did the management in *Wallace.* More importantly, however, there is uncontroverted evidence in the record which shows additional misconduct by appellant with respect to her checking activity. The court below noted:

> [A]ppellant was on a "bad-check list" during all or most of the time she was cashing the checks at the two bowling centers. She acknowledged as much in her testimony. Thus, she should not have been able to cash checks at all at either facility. She admitted that she had a "friend" who worked at Ramstein Bowling Center, and who disregarded the prohibition and cashed her checks anyway. She was herself employed part-time as a cashier at the Sembach Bowling Center, and thus was in a position to cash her own checks. She also testified that she had another "friend" at the Sembach Bowling Center who cashed her checks for her.
>
> Furthermore, there was testimony that the standard practice of NAFI management at both bowling alleys, and elsewhere, was to have the cashier initial the check. Yet, of 40 checks which are the subject of specification 2 of Charge II, only 3 had any initials at all.

47 MJ at 537.

We agree with the court below that this evidence substantially distinguishes appellant's case from *Wallace.* Clearly, she was not shown to have *just* written a bad check

for gambling funds which she later failed to cover. *See Wallace, supra* at 651, 36 CMR at 149. In addition, she was shown to have repeatedly and deliberately circumvented the efforts of *management* at both service activities *to curtail bad check-writing practices, particularly her own.* Evidence of such dishonorable conduct was not present in *Wallace* (or *Allbery*) and, in our view, would materially alter its evidentiary-sufficiency conclusion. Thus, we hold that the military judge did not err in refusing to apply the gambling limitation of *Wallace* [3] in these circumstances. *Cf. Lenton, supra* at 693, 25 CMR at 197 (actions which are related to gambling but "touch the general public" are considered entirely separate from gambling activity for purposes of criminal prosecution).

The decision of the United States Air Force Court of Criminal Appeals is affirmed.

Chief Judge COX and Judges CRAWFORD, GIERKE, and EFFRON concur.

---

**3.** As a personal note, I continue to call for the overruling of *Wallace,* the decisional basis for the Court of Criminal Appeals' action in this case. I note that *Wallace,* a 1966 decision, is predicated on older cases from Nevada where gambling was legal, but civil actions on gambling debts were nonetheless absolutely prohibited. *Id.* at 652, 36 CMR at 150. This is no longer true because, since 1983, a civil action on a debt created as a result of legalized gambling in a Nevada regulated casino is allowed in limited circumstances. *See Sigel v. McEvoy,* 101 Nev. 623, 707 P.2d 1145, 1146 (Nev.1985); *Campo v. Carnival Leisure Industries, Ltd.,* 110 Nev. 1008, 879 P.2d 745, 746 (Nev.1994); *see also Metropolitan Creditors Service of Sacramento v. Sadri,* 15 Cal. App.4th 1821, 1832, 19 Cal.Rptr.2d 646 (1993). In addition, since the time of *Wallace,* other states, albeit a minority, have opened the doors of their civil courts to actions to collect legalized gambling debts in the interest of preserving the integrity of financial transactions. *See GNOC, Corp. v. Endico,* 876 F.2d 1076, 1078 (2d Cir. 1989); *Carnival Leisure Industries, Ltd. v. Aubin,* 830 F.Supp. 371 (S.D.Tex.1993); *Houston v. Younghans,* 196 Colo. 53, 580 P.2d 801 (Colo. 1978). Thirdly, no state or federal court decision since the *Wallace* opinion has been brought to our attention which similarly applies a judicially perceived public policy against gambling to limit the scope of a criminal statute. *See Walter,* 8 USCMA at 53, 23 CMR at 277; *cf. United States v. McDonagh,* 14 MJ 415 (CMA 1983) (Congress statutorily overruled *Catlow–Russo* decisions invalidating enlistment contract and court-martial jurisdiction based on recruiter criminal conduct). Finally, in my view, a court-martial is not an appropriate vehicle to uphold a discordant public policy against general social ills; instead it is a special criminal court particularly intended by Congress to ensure discipline and justice in our armed forces. *See generally Weiss v. United States,* 510 U.S. 163, 177, 114 S.Ct. 752, 127 L.Ed.2d 1 (1994). Judge Crawford joins in this footnote.