UNITED STATES, Petitioner,

v.

**Master Sergeant James J. EWING,
United States Air Force,
Respondent.**

Misc. Dkt. No. 98–06.

U.S. Air Force Court of Criminal Appeals.

23 Nov. 1998.

Appellate Counsel for Appellant: Colonel Douglas H. Kohrt and Captain Thomas R. Uiselt.

Appellate Counsel for the United States: Lieutenant Colonel Anthony P. Dattilo, Lieutenant Colonel Michael J. Breslin, Major Ronald A. Rodgers, and Captain Martin J. Hindel.

Before YOUNG, Senior Judge, MORGAN and SCHLEGEL, Appellate Military Judges.

## OPINION OF THE COURT

YOUNG, Senior Judge:

At a general court-martial convened at Nellis Air Force Base, Nevada, the respondent was arraigned on seven specifications alleging he made and uttered 19 worthless checks [1] to seven Las Vegas casinos, totaling $1975, with the intent to defraud. Article 123a, UCMJ, 10 U.S.C. § 923a. Upon motion by the defense, the military judge dismissed six specifications and all of a seventh specification except for one check for $100, based on *United States v. Allbery,* 44 M.J. 226 (1996) and *United States v. Wallace,* 36 C.M.R. 148, 1966 WL 4432 (C.M.A.1966). The petitioner requests that we reverse and order the specifications reinstated. We find the military judge erred in applying the law

---

1. Technically, these commercial instruments were credit union share drafts, not checks. While we recognize the subtle distinction between the two, since the parties and the military judge referred to them as checks and the characterization of the instruments does not affect this decision, we will too.

to the facts and reverse his decision ordering dismissal of the specifications.

## I. Jurisdiction and Standard of Review

■ The United States may appeal an order or ruling of the military judge which terminates the proceedings with respect to a specification in cases in which a punitive discharge may be adjudged. Article 62(a)(1), UCMJ, 10 U.S.C. § 862(a)(1). The dismissal of the specifications terminates the proceedings with respect to the checks. *See United States v. Sepulveda,* 40 M.J. 856, 858 (A.F.C.M.R.1994). Each of the dismissed specifications carries a maximum punishment which includes a punitive discharge. *Manual for Courts–Martial, United States* (*MCM*), Part IV, ¶ 49e(1) (1995 ed.).

■ Despite our fact-finding powers under Article 66(c), UCMJ, 10 U.S.C. § 866(c), in ruling on issues under Article 62, we "may act only with respect to matters of law." Article 62(b), UCMJ, 10 U.S.C. § 862(b). On matters of fact, we are bound by the military judge's factual determinations unless they are unsupported by the record or clearly erroneous. *United States v. Burris,* 21 M.J. 140, 144 (C.M.A.1985). We are without authority to find facts in addition to those found by the military judge. *Sepulveda,* 40 M.J. at 858.

## II. Facts

Since we are limited in our analysis to the facts found by the military judge, we quote his findings verbatim.

The accused cashed 19 worthless checks totaling $1975 on his Nevada Federal Credit Union checking account at seven different casinos in Las Vegas, Nevada, between 17 August 1997 and 25 April 1998. The names of the seven casinos along with the dates and amounts of the 19 worthless checks are identified in the seven specifications of the Article 123a Charge against the Accused. The accused's Nevada Federal Credit Union checking account was closed on 25 August 1997 due to excessive overdrafts on his account. The accused was notified of the closure of his Nevada Federal Credit Union checking account by letter from the credit union dated 12 August 1997 and mailed to his last known address.

None of the seven casinos at which the accused uttered the 19 worthless checks is a federal instrumentality or is located on a military installation.

On most, if not all occasions, the accused had been gambling at one of the seven casinos immediately prior to uttering the 19 worthless checks. The accused made out each check to one of the seven respective casinos for amounts varying between 50 and 100 dollars and used the cashier's cage within each casino. There is only one central cashier's cage in each of the seven casinos where the accused uttered the dishonored checks. The cashier's cage in most, if not all of the seven casinos, where the accused uttered the 19 dishonored checks was located within the gaming area of each respective casino. The check cashing service at each of the seven casinos is provided as a service to the casino's patrons. In most, if not all the casinos, the accused uttered his 19 worthless checks, the accused had to get prior approval from a casino pit boss, manager or some other responsible employee. The accused had uttered dishonored checks to Las Vegas casinos prior to 17 August 1997.

Each casino has its own procedures to assess the credit worthiness of its check cashing patrons. Likewise, each casino has its own safeguards to minimize the potential for receiving dishonored checks. There is no evidence the accused ever received rolls of coins, tokens or chips from any of the seven casinos' cashiers in exchange for the worthless checks. He received paper currency.

The accused preferred methods of gambling included video poker and black jack. The video poker games used by the accused at the seven casinos accepted coins or paper currency of varying denominations. The black jack tables used by the accused accepted either cash or chips in exchange for cash at the tables. Each of the seven casinos at which the accused uttered worthless checks were in the gambling or gaming business. Each of the seven casinos at which the accused uttered

his worthless checks offered food and beverages to its patrons and some offered other forms of non-gambling entertainment.

With the exception of one, $100 worthless check uttered by the accused to Mahoney's Silver Nugget Casino on 25 April 1998, all or all but an insignificant portion of the $1875 in currency obtained by the accused from uttering the remaining eighteen worthless checks, was immediately used by the accused to participate in various gambling activities at each casino where he cashed the check.

The customary practice in Las Vegas casinos is to provide gratuitous alcoholic beverages to its patrons while they gamble. Immediately prior to uttering his worthless checks, the accused had oftentimes consumed alcoholic beverages provided gratuitously by each of the seven casinos to its gambling patrons. Likewise, the accused frequently consumed gratuitous alcoholic beverages while gambling the proceeds of the worthless checks at each casino.

In September 1997, the accused was diagnosed as alcohol dependent and a pathological gambler during his in-patient treatment at David Grant Hospital, Travis Air Force Base, California. The accused's diagnosis as alcohol dependent and a pathological gambler was confirmed in October 1997 by his treating psychologist at Nellis Air Force Base, Nevada. It is not unusual for a pathological gambler to gamble more than he or she has.

I found those portions of the accused's testimony that relate to my essential findings to be generally credible.

Nevada criminal law allows for the prosecution of those who write dishonored checks for gambling purposes with the intent to defraud. This criminal law appears to be somewhat unique to Nevada to support the State's gaming industry. Nevada civil law does not appear to allow for the recovery of money from those who write dishonored checks for gambling purposes to include dishonored checks written to get money with which to gamble.

The seven casinos at which the accused uttered 19 worthless checks are in the primary business of gambling. All other services of each of these seven casinos such as food, beverage, entertainment and check cashing are ancillary to and intended to promote the business of gambling.

The casino's check cashing service is an integral part of the casino's gambling business. Because of his military status and the relatively small amount of each of the accused's worthless checks, most of the casinos took minimal precautions to minimize the potential of receiving a worthless check from the accused.

Many, if not all, of the seven casinos the accused uttered the 19 worthless checks to, would not have cashed his checks had they known of his previous bad check writing history. Given the nature of their business, each of the seven casinos that accepted worthless checks from the accused had constructive knowledge that the accused would probably use the cash proceeds from each worthless check to gamble in their respective casino, with the exception of one, $100 worthless check uttered by the accused to Mahoney's Silver Nugget Casino on 25 April 1998. At the time the accused uttered each of the remaining 18 worthless check to the seven different, he intended to use most, if not all, the proceeds from these checks to gamble at the respective casino where he cashed the check or checks. By giving gratuitous alcoholic beverages to the accused in each of the seven casinos where he gambled, the casinos knowingly and implicitly encouraged the accused to gamble and accrue financial losses.

Each of the seven casinos had the potential ability to evaluate the accused's check writing history and credit worthiness. By failing to do so, the casinos facilitated the accused to gamble beyond his means. None of these seven on-site casino check cashing facilities could be considered innocent third parties who did not either participate in or knowingly facilitate the accused's gambling.

Each of the seven on-site casino check facilities facilitated gaming transactions

between the accused and the casino where the check cashing service was located.

There is a direct connection between the check cashing services within the seven casinos and the accused's gambling activities immediately after uttering 18 of the 19 worthless checks. It cannot be said that 18 of the worthless check transactions were entirely separate from the accused's gambling activities vis-à-vis the seven casinos where he uttered the checks.

Based on these findings, the military judge concluded that the accused could not be convicted under Article 123a, UCMJ, when the checks were written to on-site casino check cashing services engaged in the business of gambling, the accused intended to use the proceeds of the checks to gamble, and the accused did so gamble within these casinos. He then dismissed six specifications, and all but one check in the seventh, based on the public policy considerations noted in *United States v. Wallace*, 36 C.M.R. 148, 1966 WL 4432 (1966) and *United States v. Allbery*, 44 M.J. 226 (1996).

### III. The Law of Gambling and Worthless Checks

The use of worthless checks in games of chance has long been a contentious issue in military appellate courts. It is one of those issues on which appellate judges often disagree. In *United States v. Walter*, 23 C.M.R. 274, 1957 WL 4479 (C.M.A.1957), the accused was convicted of larceny. While participating in an illegal gambling game, he uttered worthless checks to other members of the game in exchange for currency and also put worthless checks in the pot. In an opinion by Judge Ferguson, the Court of Military Appeals set aside his conviction on the grounds that the game was illegal, gambling was against public policy, and therefore, the checks were void *ab initio*. Chief Judge Quinn concurred on the grounds that each of the gamblers knew the game was illegal and "gamble[d] on the honesty of the accused's intentions." *Id.* at 279 (Quinn, C.J., concurring). Judge Latimer joined the majority in condemning the crime of illegal gambling, but was unwilling to "legalize thievery." *Id.* (Latimer, J., dissenting).

In *United States v. Lenton*, 25 C.M.R. 194, 1958 WL 3111 (C.M.A.1958), the Court of Military Appeals held that a statement in mitigation made by the defense counsel was inconsistent with the accused's guilty pleas. Article 45(a), UCMJ, 10 U.S.C. § 845(a). The worthless check in that case was exchanged for poker chips. Chief Judge Quinn, writing for the majority, considered the critical question to be

> whether the alleged act of misconduct is part of, or separate from, participation in the illegal game.... Moreover, not every money transaction between the participants in a gambling game can be considered a part of the game. One player may ask another to cash a check, and when the request is honored he may pocket the proceeds without using any of it in the game. Then, he can hardly disclaim responsibility for the check on the ground that it is a gambling "loss" for which he cannot be held to account. In such a situation, the check transaction is entirely separate from the gambling activity.

*Lenton*, 25 C.M.R. at 197. The Court went on to hold that an unpaid gambling loss is not a legal debt and that under the circumstances, neither the accused's failure to pay the debt nor making and uttering the worthless check amounted to dishonorable conduct.

*United States v. Wallace*, 36 C.M.R. 148, 1966 WL 4432 (C.M.A.1966) involved bad checks and arguably *legal* gambling. Major Wallace was convicted of four specifications of making and uttering worthless checks and then dishonorably failing to place and maintain sufficient funds in his account for payment of the checks, in violation of Article 134, UCMJ, 10 U.S.C. § 934, and deceitfully and dishonorably failing to maintain sufficient funds to pay 33 checks on presentment, in violation of Article 133, UCMJ, 10 U.S.C. § 933. The accused wrote the bad checks and IOUs to purchase quarters from the bartender to play slot machines that were in the officers' club bar pursuant to U.S. Army Europe regulations. At the end of the evening or later, the accused would redeem his IOUs by giving the club manager a check. When his bank returned the checks unpaid, the accused replaced them with other checks

which were also dishonored. The club would then roll the debt for the bad checks over into the accused's club bill. Judge Ferguson, with Judge Kilday concurring, found it unnecessary to decide whether the gambling operations of the club were legal. "[W]hether gaming is legal or illegal, transactions involving the same or designed to facilitate it are against public policy, and the courts will not lend their offices to enforcement of obligations arising therefrom." *Id.* at 151.

In deciding to reverse Major Wallace's conviction, the Court found his conduct was not dishonorable. The checks Major Wallace wrote were tied directly to his gambling activities—he purchased rolls of quarters to play the slot machines—and, the club management, despite knowing of the deep financial problems gambling was causing Major Wallace, encouraged him to continue to gamble. Chief Judge Quinn, who wrote the majority opinion in *Lenton,* dissented. *Id.* at 151 (Quinn, C.J., dissenting). He disagreed with the majority's conclusion that participating in *legal* gambling "is contrary to the good morals and the public policy of the military community." *Id.* at 152.

Much of the recent turmoil in the lower courts was a result of our decision in *United States v. Allbery,* 41 M.J. 501 (A.F.Ct.Crim. App.1994), *rev'd,* 44 M.J. 226 (1996). We affirmed Allbery's conviction, under Article 134, for making and uttering worthless checks by dishonorably failing to maintain sufficient funds in his account. In doing so, we declined to distinguish the case from *Wallace.* Instead, we held that *legal* gambling was not against public policy. The Court of Appeals for the Armed Forces reversed without a majority opinion.

In the four separate opinions, the judges of the Court of Appeals for the Armed Forces seemed to agree on only two issues: (1) the Court of Criminal Appeals had no authority to determine that public policy had changed and thus decline to follow *Wallace;* and, (2) even if the Court of Criminal Appeals had the authority to decline to follow *Wallace,* such a new rule could not be applied to Airman Allbery. In the lead opinion, Senior Judge Everett, with Chief Judge Cox concurring, found that the public policy against

gambling had not changed "discernibly" and the facts were not distinguishable from those in *Wallace.* Judge Sullivan read *Wallace* more narrowly. He concluded that the facts were distinguishable. In addition, he would have overruled *Wallace* prospectively. Judge Crawford opined that the Court could have taken judicial notice of the current public policy and decided the case prospectively. Judge Gierke was unwilling to uphold the policy underlying *Wallace,* but believed the issue was not properly before the Court.

Although the Court of Appeals for the Armed Forces has never suggested that *Wallace* applies to cases prosecuted under Article 123a, UCMJ, the Army Court of Criminal Appeals, without critical evaluation, has done so. *See United States v. Greenlee,* 47 M.J. 613 (Army Ct.Crim.App.1997); *United States v. Thompson,* 47 M.J. 611 (Army Ct.Crim. App.1997); *United States v. Green,* 44 M.J. 828 (Army Ct.Crim.App.1996).

In *Green,* the accused pled guilty to making and uttering worthless checks to the post club in violation of Article 123a. He told the military judge that he used the money from the checks to play the slot machines in a small casino located within the club. The Army Court found the military judge erred in not seeking clarification of the accused's statements concerning gambling, which were inconsistent with his guilty plea. Article 45(a), UCMJ. "The record is silent concerning ... any other factors that might negate the conclusion that the bad checks created a gambling debt." *Green,* 44 M.J. at 830. The Court explained the law as follows:

> [A]s a matter of public policy, military courts may not punish soldiers for check offenses arising from gambling debts. Under military law, a worthless check is a "gambling debt" if it is accepted from a soldier by a government check cashing facility for the purpose of supplying that soldier with money to gamble in an on-site gambling enterprise legally operated by the government. *Allbery,* 44 M.J. 226; *Wallace,* 15 U.S.C.M.A. 650, 36 C.M.R. 148, 1966 WL 4432.... However, check offenses are punishable under the UCMJ, if the facts show no direct connection between the check cashing services and the

gambling activity. *United States v. Slaughter*, 42 M.J. 680, 682 (Army Ct. Crim.App.1995).

*Green*, 44 M.J. at 829.

In *Thompson*, the accused pled guilty and was convicted of drawing and uttering worthless checks with the intent to defraud in violation of Article 123a, UCMJ. One of the specifications concerned three $50 checks she had written to the Navy Club—she received $40 in rolls of quarters and $10 in currency for each of the three checks. The Army Court of Criminal Appeals affirmed, holding that "the public policy protection of *Wallace* was not triggered since *all* of the money was not intended to be used for gambling." *Thompson*, 47 M.J. at 612. The Court of Appeals for the Armed Forces set aside that decision and remanded the case for further review based on its decision in *Allbery*. Upon further review, the Army Court again held that the accused's conduct "is criminally punishable even though, in this instance, she subsequently used most of the ill-gained cash proceeds to gamble at near-by slot machines." *Id.* at 612. The Army Court only affirmed as much of the conviction as concerned the $10 of each check for which the accused received money other than quarters.

In *Greenlee*, the accused was convicted of making and uttering 48 worthless checks with intent to defraud in violation of Article 123a. The accused claimed the military judge should have dismissed the portions of the guilty plea relating to the cashing of worthless checks to get coins to play government supported slot machines. The Court followed the approach it had taken in *Thompson* and granted relief as to the amounts of the checks for which the accused received rolls of quarters.

> *Allbery* reaffirmed the thirty-year-old principle first recognized in *United States v. Wallace*, 15 U.S.C.M.A. 650, 36 C.M.R. 148, 1966 WL 4432 (1966), that transactions designed to facilitate on-site gambling activities are against public policy and the courts will not enforce commercial transactions evolving therefrom. If a service club offers the convenience of check-cashing to facilitate on-site gambling, the

conditions for applying the public policy protection of *Wallace/Allbery* are satisfied.

> *Greenlee*, 47 M.J. at 614. (Citations omitted).

## IV. Discussion

■ The United States asserts that the military judge erred because (1) *Wallace* does not apply to offenses prosecuted under Article 123a, UCMJ, and (2) even if *Wallace* applies to Article 123a cases, the facts are distinguishable. While not fatal to petitioner's case, we note two flaws in the government's brief. First, the petitioner is wrong in asserting that Article 123a was enacted after the *Wallace* decision. Article 123a was enacted on 4 October 1961 and became effective on 1 March 1962. Pub.L. No. 87–385, 75 Stat. 814. Major Wallace was charged with making and uttering the worthless checks from 1 April 1963 to 1 January 1964, well after the effective date of Article 123a. Second, the government incorrectly concurs with the military judge's clearly erroneous finding that, under Nevada law, an individual is not civilly liable for writing worthless checks for the purpose of gambling. Since 1983, Nevada law has provided that "gaming debts not evidenced by a credit instrument are void and unenforceable and do not give rise to any administrative or civil cause of action." Nev. Rev.Stat. § 463.361(1). *Those evidenced by a credit instrument are enforceable. See United States v. Eatmon*, 49 M.J. 273 (1998) (citing *Sigel v. McEvoy*, 101 Nev. 623, 707 P.2d 1145 (1985)).

Petitioner's assignments of error can be resolved by closely examining the holding in *Wallace* "that the issuance of a worthless check *in a gambling game* or *as a means of facilitating a gaming transaction* cannot be made the basis of a criminal prosecution for allegedly '*dishonorable*' conduct, as here charged." *Wallace*, 36 C.M.R. at 151 (emphasis added).

Article 123a, UCMJ, encompasses two distinct types of bad-check offenses: (1) when checks are written for the procurement of any article or thing of value, with intent to defraud; and (2) when checks are written for the payment of any past due obligation, or for any other purpose, with intent to deceive.

In the instant case, the respondent, Master Sergeant Ewing, is charged with making and uttering the checks for things of value (currency) with the intent to defraud, under Article 123a(1), UCMJ.

The focus of an Article 134 bad-check offense is what the accused does after he makes and utters the check—he must have *"failed to place or maintain sufficient funds in or credit with the drawee bank for the payment of the check in full upon its presentment for payment."* MCM, Part IV, ¶ 68b(3). The accused's conduct must be "dishonorable"; that is, at a minimum, it must evidence a grossly indifferent attitude toward his account. MCM, Part IV, ¶ 68c. There is no allegation of criminal conduct in the making or uttering of the check. On the other hand, the focus of an Article 123a(1) worthless-check offense, is on what the accused knew and intended when he made and uttered the check. At the time the accused made or uttered the check, he must have known that he did not or would not have sufficient funds in his account for payment in full upon its presentment, and he must have made or uttered the check with the intent to defraud. MCM, Part IV, ¶ 49b and c. *Cf. United States v. Margelony*, 33 C.M.R. 267, 270–72, 1963 WL 4849 (C.M.A.1963). There is no evidence that our superior court meant to extend the gambling policy bar to prosecution to cases in which an accused's intent in issuing the check is to defraud the payee, and we will not do so.

Even if we were to agree that *Wallace* should apply to Article 123a offenses, the petitioner would still be entitled to relief. Based on the facts in *Wallace*, and the cases cited therein, the Court appears to have intended the terms "in a gambling game" and "a means of facilitating a gaming transaction" to have restricted meanings. "In a gambling game" refers to using the check directly to participate in a game of chance— for example, putting the check into the pot of a dice or card game, purchasing a number, or placing a bet with a check. *Cf. Lenton*, 25 C.M.R. at 197; *Walter*, 23 C.M.R. at 278. "A means of facilitating a gaming transaction" refers to using a check to purchase an instrument uniquely necessary to participate in the game of chance—for example, buying gambling chips, tokens, bingo cards, or in Major Wallace's case, rolls of quarters.

The respondent did not make and utter these checks "in a gambling game" as none of the checks were placed in the pot or were used to place a bet. Nor did the accused issue the worthless checks "as a means of facilitating a gaming transaction." He did not receive chips, tokens, or even rolls of quarters. Instead, he issued personal checks to the casinos' cashiers in exchange for United States currency. While currency can be used in games of chance, it is not the type of instrument that would uniquely facilitate gambling. It is the currency of the realm that he could have used in any manner he saw fit.

Furthermore, while casinos no doubt cash checks to encourage the makers thereof to spend some of it gambling, there was no evidence of overreaching as there was in *Wallace*. In fact, the casinos were unaware of the accused's financial difficulties and would have refused to cash his checks if they had known.

In sum, *Wallace* doesn't apply to cases prosecuted under Article 123a, and, even if it did, the conduct of the casino staffs was insufficient to trigger relief for the accused.

## IV. Conclusion

The ruling of the military judge dismissing the offenses is reversed and the specifications are reinstated. The record is returned to the military judge for proceedings not inconsistent with this decision.

Judge MORGAN and Judge SCHLEGEL concur.